Sterling A. Brennan (Utah State Bar No. 10060; E-mail: sbrennan@mabr.com)
R. Parrish Freeman (Utah State Bar No. 07529; E-mail: pfreeman@mabr.com)
MASCHOFF BRENNAN LAYCOCK GILMORE ISRAELSEN & WRIGHT PLLC
201 South Main Street, Suite 600
Salt Lake City, Utah 84111
Telephone:  (435) 252-1360
Facsimile:   (435) 252-1361

Michael A. Jacobs (*Pro Hac Vice*; E-mail: MJacobs@mofo.com)
Eric M. Acker (*Pro Hac Vice*; E-mail: EAcker@mofo.com)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone:  (415) 268-7000
Facsimile:   (415) 268-7522

Jeffrey A. Jaeckel (*Pro Hac Vice*; E-mail: JJaeckel@mofo.com)
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue NW, Suite 6000
Washington, DC  20006-1888
Telephone:  (202) 887-1500
Facsimile:   (202) 887-0763

Attorneys for Plaintiff ENTRATA, INC. (F/K/A PROPERTY SOLUTIONS INTERNATIONAL, INC.)

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| PROPERTY SOLUTIONS INTERNATIONAL, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>YARDI SYSTEMS, INC., a California corporation,<br><br>Defendant. | Civil Action No. 2:15-CV-00102-CW-PMW<br><br>**PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>**Jury Trial Demanded**<br><br>HON. CLARK WADDOUPS, DISTRICT JUDGE<br><br>HON. PAUL M. WARNER, MAGISTRATE JUDGE |

Plaintiff Entrata, Inc. (formerly known as Property Solutions International, Inc.) ("Entrata"), for its First Amended Complaint ("Complaint") against defendant Yardi Systems, Inc. ("Yardi"), hereby alleges as follows:

## I.   THE PARTIES

1.   Entrata is a Delaware corporation with its principal place of business located at 2912 Executive Parkway, Suite 100, Lehi, Utah 84043.

2.   Yardi is a California corporation with its principal place of business located at 430 South Fairview Avenue, Santa Barbara, California 93117.

## II.   JURISDICTION AND VENUE

3.   This civil action (the "Action") arises under the laws of the United States (*i.e.*, the Lanham Act, 15 U.S.C. § 1051 *et seq*., and the Sherman Act, 15 U.S.C. § 1 *et seq*.) and Utah statutory and common law.  The above-entitled Court has jurisdiction over the subject matter of the federal law claims for relief in the Action pursuant to 28 U.S.C. § 1331 and Section 16 of the Clayton Act, 15 U.S.C. §§  26, and supplemental jurisdiction over the Utah state law claims for relief pursuant to 28 U.S.C. § 1367.  The Court also has jurisdiction over the subject matter of each of the claims for relief asserted by Entrata in the Action pursuant to 28 U.S.C. § 1332, in that there is complete diversity of citizenship between the two parties (*i.e.*, Entrata is a Delaware corporation and Yardi is a California corporation) and the amount placed in controversy by each of the first through ninth claims for relief herein exceeds $75,000, exclusive of interest, costs, and attorneys' fees.  Likewise, the value of the non-monetary relief sought by the claims for relief set forth herein also exceeds $75,000, exclusive of interest, costs, and attorneys' fees.

4.      The Court may, and should, exercise personal jurisdiction over Yardi because, among other things, Yardi (a) conducts substantial business within Utah, (b) has entered into contracts in Utah, including with respect to the subject matter of the claims for relief asserted in the Action, (c) has committed tortious and other improper acts causing harm to Entrata within Utah, and (d) has made other relevant contacts in Utah.

5.      Venue in this judicial district (*i.e.*, within the State of Utah) is proper pursuant to 28 U.S.C. § 1391(b) and Section 12 of the Clayton Act, 15 U.S.C. § 22, in that (a) a substantial part of the events giving rise to Entrata's claims for relief occurred, (b) Yardi is subject to this Court's personal jurisdiction, and (c) Yardi may be found, in this judicial district.

### III.   FACTUAL BACKGROUND

6.      Entrata and Yardi are each software and technology companies, and each makes and sells various competing property management software products.  Property management software—depending upon its features—generally allows owners and managers of multiple rental and lease units to better manage their rental properties by offering functionality to perform accounting and management tasks, including, but not limited to, accounting and revenue management, marketing available units, processing rental applications, organizing and storing resident information, receiving and responding to maintenance requests from residents, managing utility usage and costs, and processing rent payments.

7.      This Action, and Entrata's Complaint, arise from Yardi's pattern of unfair, unlawful, and anti-competitive actions against its competitors both in the Accounting Product Market and Integration Product Market (as defined below at ¶ 96, respectively, and collectively the "Relevant Markets"), including but not limited to Entrata, with respect to the sale and use of

property management software (or Yardi's attempts to block the sale and use of competing products offered by Entrata and other competitors).  Upon information and belief, and as described below, Yardi's intentional conduct has severely harmed both (a) competitors (including, but not limited to, Entrata, MRI, Ellipse, On-site, G5, Appfolio, RealPage, SafeRent, Property Boss, and ResMan), which now lose the ability to build their own custom integrations if they so choose, and their current and prospective customers, and (b) Yardi's and its competitors' current and prospective customers; and will continue to cause injury to current and potential future customers by interfering with full and free competition in the Relevant Markets by Entrata and other providers of property management software.

### A.    Entrata and Its Products

8.    Entrata was founded in 2003 by three students at Brigham Young University ("BYU"), with the goal of designing and marketing a new property management software product.  Those founders won BYU's business plan competition, and then went on to take first place in FORTUNE SMALL BUSINESS MAGAZINE's 2003 MBA Showdown—a national business plan competition among winners of all accredited, MBA-sponsored business plan competitions.

#### *Entrata's Platform Products*

9.    Since its founding in 2003, Entrata has grown to, at present, nearly 700 employees working in four offices throughout the United States, and was the first comprehensive property management software provider to offer a single-login, open-access, "Platform as a Service" ("PaaS") system.  PaaS systems provide for a range of functionalities, such as marketing available units, processing rental applications, organizing and storing resident information, taking and responding to maintenance requests from residents, managing utility usage and costs, and

processing rent payments as described in ¶ 6 above.  These features of a PaaS system are made possible through integration with a separate core accounting software service.

10.     For example, the PaaS system marketed by Entrata, now called ENTRATA® PAAS ("Entrata PaaS"), offers a wide variety of online property management tools built around, and that successfully integrate with, among others, Entrata's core accounting and property management database software:  ENTRATA® CORE ("Entrata Core").  The various individual functions or "point solutions" included with Entrata PaaS, as described in ¶ 9 above, that "plug-in" or are integrated into Entrata Core include: property website management, mobile/smartphone applications, payment, leases and applications, document execution, accounting, and additional resident management, marketing and leasing tools (these plug-in or integration products, functions, or tools included in the PaaS system marketed by Entrata are referred to collectively as "Entrata's Point Solution Products" or "Point Solution Products").  Entrata also makes these individual point solution products available to integrate with other core accounting database software products.

11.     Entrata PaaS is currently used at more than 20,000 apartment communities, with a minimum of 1,000 units (or apartments) nationwide, including 33 of the National Multifamily Housing Council's "Top 50 Largest Managers."  Entrata's open application program interface ("API") and superior selection of third-party integrations (*i.e.*, Entrata's Point Solution Products) offer property management companies the freedom to choose the technology and software that best fit their needs by combining their choice of Point Solution Products with core accounting and property management database software.

/ / /

12.    Entrata's products and efforts in recent years have garnered considerable industry attention and accolades.  For example, in 2013, in recognition of its three-year growth of 496%, Entrata was ranked by INC. MAGAZINE as Utah's third largest privately-owned job creator (and the 59th largest nationwide) in the second annual "Hire Power Awards," honoring companies that lead the way in creating American jobs.

13.    As mentioned above, in addition to Entrata PaaS, Entrata markets several discrete products, including a suite for *accounting* (*i.e.*, Entrata Core), suites for *marketing* (*i.e.*, ProspectPortal®, ILS Portal®, Entrata® Pricing™, SEO Services, ReputationAdvisor™, and LeadManager™), suites for *leasing* (*i.e.*, SiteTablet®, LeaseExecution™, ResidentVerify®, DocumentStorage™; and Leasing Center™), and suites for *resident management* (*i.e.*, ResidentPortal, ResidentInsure®, ResidentPay®, Message Center™, ResidentUtility®, and ParcelAlert™), among others.

14.    In 2003, Entrata designed and marketed its flagship core accounting and property management database software product, which initially was called "Vantage XP."  This product was renamed "Resident Works" in 2004, and then renamed again to "Entrata Core" in 2012. Shortly after its founding, however, and until 2012, Entrata decided to change its primary focus from what would become Entrata Core to property website management and Point Solution Products that were designed for use with existing third-party core accounting database software products (such as Yardi's Voyager Residential software product ["Voyager"]), while continuing to support existing Vantage XP/Resident Works customers.

/ / /

/ / /

***Entrata's Point Solution Products***

15.     As described in ¶ 10 above, Entrata markets several Point Solution Products.  In 2004, Entrata pioneered ResidentPay®, which allows residents to pay their rent to a property management company online.  Entrata also developed two categories of websites that interfaced with existing property management software:  (a) "ProspectPortal®," which is directed at *potential residents* and allows them to review property listings, take virtual tours of properties, and submit rental applications and fees; and (b) "ResidentPortal," which is directed at *current residents*, and allows them to, among other things, pay their rent online (via ResidentPay®), read and post to community message boards, submit maintenance requests, and view event calendars.  Each of Entrata's Point Solution Products can be customized either to add or remove features according to the needs and requests of individual customers.

16.     Entrata's Point Solution Products serve as the portal or access point between an end user (*e.g.*, a resident or prospective resident) and a core accounting database (*e.g.*, of the type sold by Entrata, Yardi, Real Page, or another third party).  Entrata's Point Solution Products move information to and from such a database through a specialized interface in order to fulfill an end user's requests.  For example, a prospective resident might use a website generated by Entrata to view information regarding apartment pricing and availability (pulled from the core accounting database) and then fill out a guest card or rental application.  The information provided by the prospective resident is then transferred back to the core accounting and property management database, through a software interface, and stored.  When the property manager later searches for that information, the database locates and sends the information back to another Entrata Point Solution Product, where it is displayed to the property manager.  Entrata has successfully

integrated such Point Solution Products with the core accounting and property management databases of several other software vendors in the industry, including the largest and dominant provider of such software: Yardi.

17.     In 2012, with the launch of Entrata PaaS, Entrata became the first single-platform, multi-tenant property management software provider with a comprehensive, cloud-based product suite for the enterprise property management market. Entrata's platform—including the Entrata Point Solution Products that integrate seamlessly with Entrata Core and were constructed using the same software architectural design—offers a wide variety of software capabilities for property managers through the use of PaaS technology. The databases and programming code required to provide these capabilities are stored, maintained, and administered by Entrata, rather than locally on a customer's computers or servers. This cloud-based approach allows customers to make use of Entrata's software while dramatically lowering their information technology costs.

**B.     Yardi and Its Products**

18.     Yardi is the dominant provider of core accounting database software for use by the multi-family housing industry in the United States. Upon information and belief, more than eight million residential units are managed using Yardi software, and more than 1,650 property management customers are using Yardi Voyager 7S (as opposed to other versions of Yardi's property management accounting software, such as Genesis and Enterprise), Yardi's self-proclaimed "most advanced property management platform."

19.     Yardi offers several versions of its property management accounting software for the multifamily industry, including Yardi Genesis and Yardi Enterprise, each of which in

combination with Voyager creates a significant client base in the core accounting and property management database software market.

20.     In 2003, when Entrata was founded, Yardi had already long been, since 1984, in the business of providing property management *accounting* software.  Yardi's products did *not* then include specialized tools or integration products (such as the Point Solution Products developed by Entrata) focused on providing services to residents and prospective residents, such as guest cards (in which, for example, a prospective resident provides contact information and details on the type of unit sought), rental applications, payments, and maintenance request processing.  Further, as Entrata understands Yardi's accounting software, it did not (in contrast to the Point Solution Products made available by Entrata) allow any significant customization for individual property management customers.  As a result of the limitations of Yardi's core accounting software products (primarily Voyager, as further described below), and for Yardi's own benefit to enable it to meet the needs and demands of its customers, Yardi—at least initially—actively encouraged third parties, including Entrata, to develop specialized modules or plug-ins to interface with Yardi's core accounting software, including Voyager.  Yardi also provided the technical support necessary to facilitate those third-party integrations.

21.     When, however, third-party integration products (including products offered by competitors such as Entrata) began to threaten Yardi's dominance and control in the market for core accounting and property management database software, Yardi responded by (a) undertaking initiatives to damage and/or undermine the performance and marketability of those third-party integration products (including but not limited to Entrata's Point Solution Products) and (b) undertaking to expand beyond its original core accounting software (*i.e.*,

Voyager) and offering products intended to leverage Yardi's existing dominance in core

accounting software into the adjacent product category for integration products, thereby

supplanting those competitors who offered third-party products that posed a threat to Yardi's

dominance (including but not limited to Entrata and its Point Solution Products).

22.     Yardi's new offerings include "suites" similar to those offered by competitors

such as Entrata.  Marketed by Yardi under the name "Yardi Multifamily Solutions," the software

suites presently available are:

a.     a property management suite (Yardi Voyager® Residential), which provides

bundled core accounting and property management database services;

b.     the "Yardi Marketing Suite" (comprised of Rent *Café*™, Yardi LeasingPad

CRM™, and Rent *Café* Connect™), which provides marketing and leasing

services; and

c.     the "Yardi Multifamily Suite" (comprised of RENTmaximizer, Yardi Resident

Screening™, ResidentShield® Protection Plan, Yardi Energy Solutions™, Yardi

Payment Processing™, Yardi Procure to Pay™, Yardi Orion™ Business

Intelligence, and Yardi Orion™ Document Management).

(Yardi's plug-in or portal products intended to compete with Entrata's Point Solution Products

are sometimes referred to herein collectively as "Yardi's Plug-In Products.")

/ / /

/ / /

/ / /

/ / /

9

23.     The following table shows comparisons between Entrata's products and Yardi's:

| Entrata's Product | Yardi's Competing Product | Entrata's Product Suite | Yardi's Product Suite |
|---|---|---|---|
| **Entrata Core** (property management accounting, reporting, purchasing, facilities management, resident management, and leasing data) | **Yardi Voyager Residential** (property management accounting, reporting, and analytics) and **Yardi Orion Business Intelligence** (produces flexible reports and dashboards that combine operational, financial, and ancillary data) | Management | Yardi Multifamily Suite |
| **Craigslist** (part of internet listing service ["ILS"] tools) | **Rent *Café*** (marketing websites, lead generation, social media marketing, reputation management, leasing, rent payments and maintenance requests) | Marketing | Yardi Marketing Suite |
| **ILS Portal** (online marketing with automated feeds to all major Internet Listing Services) | **Rent *Café*** (defined above) | Marketing | Yardi Marketing Suite |
| **PricingPortal** (revenue management system used to monitor and predict rent lifecycle, area rent rates, automatically update prices in marketing and ILS feeds) | **RENTmaximizer** (revenue management system used to price leases using the balance between real-time inventory, traffic, and market conditions) | Marketing | Yardi Multifamily Suite |
| **ProspectPortal** (marketing websites, lead generation conversion and tracking, guest card integration, showcasing listings in real time) | **Rent *Café*** (defined above) | Marketing | Yardi Marketing Suite |
| **SEM Services** (combines search engine optimization ["SEO"] and pay-per-click ["PPC"] services for better website marketing) | **Rent *Café*** (defined above) | Marketing | Yardi Marketing Suite |

| Entrata's Product | Yardi's Competing Product | Entrata's Product Suite | Yardi's Product Suite |
|---|---|---|---|
| **Social Media** (brings ProspectPortal and ResidentPay functionality to a property's Facebook fan page) | **Rent *Café*** (defined above) | Marketing | Yardi Marketing Suite |
| **Mobile Portal (legacy)** (mobile version of Prospect and ResidentPortal) | **Rent *Café*** (defined above) | Marketing / Residents | Yardi Marketing Suite |
| **Call Analysis** (evaluate property lead calls to assess the performance of leasing agents on site) | **Rent *Café* Connect** (Yardi associates receive and respond to resident calls, and enter maintenance requests and credit card payments) | Leasing | Yardi Multifamily Suite |
| **LeadManager** (consolidates lead traffic into one central dashboard, providing reminders and alerts, reporting, and marketing insight) | **Yardi PopCard™** (tracks and manages leads, maximizes leasing and retention, and improves sales and employee performance) | Leasing | Yardi Multifamily Suite |
| **LeaseExecution** (allows prospects and residents to digitally sign leases in a secure environment) | **Rent *Café*** (defined above) | Leasing | Yardi Marketing Suite |
| **Leasing Center** (Entrata associates receive and respond to resident calls, set appointments, handle maintenance requests, and follow up with prospects) | **Rent *Café* Connect** (defined above) | Leasing | Yardi Marketing Suite |
| **ResidentVerify** (real-time applicant and employee background and credit screening services) | **Yardi Resident Screening** (tenant screening system offering background checks and credit reports) | Leasing | Yardi Multifamily Suite |
| **SiteTablet** (remotely access community information, real-time pricing and availability, applications, and leasing) | **LeasingPad CRM** (remotely access contact, lead, lease, resident, and property data) | Leasing | Yardi Marketing Suite |
| **Call Tracker™** (provides the ability to track record and report on all incoming calls to the property) | **Yardi PopCard** (defined above) | Leasing / Marketing | Yardi Multifamily Suite |

11

| Entrata's Product | Yardi's Competing Product | Entrata's Product Suite | Yardi's Product Suite |
|---|---|---|---|
| **Message Center** (allows property managers to communicate efficiently with both prospective and current clients via text message, personal e-mail, or bulk e-mail) | **Rent *Café*** (defined above) | Residents | Yardi Marketing Suite |
| **ParcelAlert** (package tracking system designed to streamline package logistics and decrease delivery time by sending automatic e-mail or text notifications to residents) | **Rent *Café*** (defined above) Via **Yardi Concierge™** (allows residents to authorize guests, reserve amenities, and track deliveries online) | Residents | Yardi Marketing Suite |
| **ResidentPay Check Scanning** (allows property manager to scan personal or corporate checks at the office and payment is posted automatically to the resident's ledger) | **Yardi Online Payments** (includes Yardi Walk-in Payment System, online payments, and check scanning) | Residents | Yardi Multifamily Suite |
| **ResidentInsure** (provides access to insurance coverage against theft, fire, liability, and more to residents during the lead-to-lease process) | **ResidentShield Protection Plan** (comprehensive property risk management with two renter's insurance options that protects owner assets and provides reliable coverage to renters) | Residents | Yardi Multifamily Suite |
| **ResidentPay** (allows residents to pay rent online via credit card, debit card, Moneygram, check scanning, or other methods) | **Yardi Online Payments** (defined above) | Residents | Yardi Multifamily Suite |
| **ResidentPortal** (provides residents 24-hour access to pay rent and submit work orders; updates community information) | **Rent *Café*** (defined above) | Residents | Yardi Marketing Suite |

| Entrata's Product | Yardi's Competing Product | Entrata's Product Suite | Yardi's Product Suite |
|---|---|---|---|
| **ResidentUtility** (paperless utility billing and management solution built to increase asset value by ensuring proper utility billing) | **Yardi Energy Solutions** (automated utility billing, energy management, and submeter data administration) | Residents | Yardi Multifamily Suite |
| **InspectionManager™** (provides the tools required to manage and perform inspections of every unit, building and amenity at a property level) | **Yardi Inspections** (schedule, perform, and manage all types of inspections, including annual, regulatory, due diligence and more) | Management | Yardi Multifamily Suite |
| **ReputationAdvisor™** (gathers property reviews from across the web into one easy-to-use area, giving property management professionals the ability to stay on top of what renters are saying about their community) | **Rent *Café*** (defined above) | Marketing | Yardi Marketing Suite |

***Voyager's Market Dominance***

24.     Yardi's Voyager product is core accounting and property management database software designed for property owners, managers, and investors.  On information and belief, Voyager has a greater than 60% share of the market for property management accounting software used by the enterprise multi-family housing industry (usually, for properties with at least 1,000 units) in the United States (the "Accounting Product Market").  Other competitive, substitutable software products with far less significant market share in the Accounting Product Market include Entrata Core, as well as those offered by AMSI, RealPage, Appfolio, Buildium, and MRI, among others.

25.     Historically, Yardi allowed several different hosting options for its software and databases, including the option for clients to host their own databases ("self-hosted"), use third-

party hosting companies, or use Yardi's hosting services ("Yardi-hosted").  Currently, however,

Yardi is pushing all of its clients to move to Voyager 7S, where the only option is Yardi-hosted.

      **C.**    **Entrata's and Yardi's Initial "Friendly" Collaborations**

26.    On or about September 28, 2004, Entrata and Yardi executed their first Non-

Disclosure Agreement (the "2004 NDA").  In that same year, Yardi began working with Entrata

to aid in the development of an integration between Entrata's ResidentPay online payment

system (one of Entrata's Point Solution Products) and Yardi's various core accounting software

products, including predominantly Voyager.  Yardi actively facilitated Entrata's development

and construction of Entrata's custom integration utility by sending Entrata a copy of its Genesis

software and database, allowing Entrata to access the Voyager software and database,

troubleshooting the utility, and providing support to mutual customers using the utility.

27.    After receiving the Genesis software and access to the Voyager software and

database, Entrata began to collaborate directly with Yardi developers on two types of

integrations with Yardi's databases:  (a) self-hosted integrations, in which the Entrata-designed

interface tool would be located on the customer's server with the customer's Yardi database; and

(b) Yardi-hosted integrations, in which the Entrata-designed interface tool would be installed on

Yardi's servers, which also hosted the customer's database.

28.    On or about February 24, 2006, Entrata and Yardi executed a second Non-

Disclosure Agreement (the "2006 NDA"), by which each party agreed not to "modify, reverse

engineer, duplicate, simulate, decompile, create derivative works from, or disassemble the [other

party's] software programs without the other party's prior written consent."  The parties further

agreed "[i]n no event shall a party use the other party's Confidential Information to the detriment of or in competition with the other party."

29. Also in 2006, Entrata successfully deployed its first self-hosted Yardi integration, which provided a customer the ability to process payments through Entrata's website interface and push data from Entrata's databases to the client's Yardi database, and vice versa, in real time. At about the same time, Yardi began to market and sell its own Plug-In Products to compete with Entrata's Point Solution Products. Despite this, Yardi continued to assist Entrata in deploying its custom integrations to customers who were using Yardi's core accounting software. Later in 2006, Entrata deployed a beta version of this integration for another mutual customer of Yardi and Entrata. Entrata also contacted Yardi, proposing that it become one of Yardi's third-party integrators in the Yardi-hosted environment. At Yardi's request, Entrata sent Yardi contact information for its key developers, corporate information, and several proposals related to the creation of the integration.

30. Yardi also encouraged third-party vendors to develop software that communicated with Yardi's database through a Yardi-designed standard interface. The Yardi standard interface, however, was incapable of facilitating much of the functionality requested by Entrata's customers. Yardi continued to encourage Entrata's development of its products and further encouraged Entrata to continue to design its own custom interfaces with the Yardi core accounting software, and in reliance thereon Entrata did so. Entrata's custom interface tools (which allow its Point Solutions Products to communicate with customers' Yardi databases) provided (and still provide) several advantages over Yardi's standard interface, including the complex integration of payments, balance inquiries, maintenance requests, and unit availability requests. Entrata's

custom interfaces also allowed (and still allow) information to flow through in real time, rather than only being updated in a nightly feed.  Users of Entrata's interface tools would lose substantial functionality if Yardi were to force the Entrata interface tools to communicate with a Yardi core accounting database through the Yardi standard interface.

31.     In the early years of their relationship, Yardi encouraged Entrata to develop high quality custom integrations with Yardi's software databases, and it even provided Entrata with the technical details that allowed Entrata to encourage those integrations.  Additionally, Yardi facilitated Entrata's receipt both of a license file to access the Voyager application and a copy of the Yardi database from a potential mutual customer, in order to enhance the Entrata custom integration.

32.     As Entrata worked to perfect its custom interfaces with Yardi's databases, Yardi developers provided extensive encouragement through technical support, including disclosure of information necessary to allow Entrata's software to "talk" to Yardi's databases.  Yardi personnel volunteered information about the design of Yardi's software and database, the configuration of the Yardi database tables, and the queries that Yardi's software used to interact with those tables.  In March 2007, Entrata developers began working with Yardi developers on testing and troubleshooting Entrata's Yardi-hosted integration.

33.     As part of the parties' ongoing business relationship, in 2007 Entrata sent Yardi a copy of the source code used in Entrata's integration utility.  Yardi reviewed that source code, conducted a security review of the software, and ultimately approved Entrata's custom integration for installation on its servers for its Yardi-hosted clients.

/ / /

34.     In early 2008, Yardi identified Entrata as an "approved integration partner" for both self-hosted and Yardi-hosted customers.

35.     Yardi specifically encouraged and facilitated Entrata's development of custom integrations because those integrating products enhanced the value and attractiveness of Yardi's core accounting software products, and Yardi profited from its customers' adoption of Entrata's software as a custom interface to be used with Yardi's software databases.  On information and belief, by March 2008, Yardi was annually charging its customers the greater of $250 per property or $2,500 annually to use Entrata's integration utility, if the utility was hosted on Yardi's servers.  For many property management companies with hundreds of properties, a per-property charge of $250 amounted to substantial annual payments to Yardi.

36.     In addition, Entrata often referred customers interested in the features and convenience of its Point Solution Products to Yardi, and recommended that they use Yardi's property management accounting software.  Similarly, Yardi referred customers to Entrata's Point Solution Products.  Entrata's Point Solution Products provided a great benefit to Yardi, and made Yardi's accounting products more attractive and competitive because they allowed Yardi to offer its customers access to features not available in Yardi's own software.

37.     Soon, Entrata began contracting with an increasing number of customers interested in Entrata's Point Solution Products.  For example, in September 2008, Entrata entered into a license agreement to create custom integrations for its Point Solution Products with Yardi's then-largest customer.

38.     In December 2008 (shortly after Entrata had displaced a number of significant customers from Yardi's Plug-In Products), Yardi wrote to vendors, informing them that they

17

needed to be "SAS70" compliant to continue interfacing with Yardi property management accounting software products.  SAS70 (now known as SSAE 16) is an auditing standard used to verify that service providers have adequate controls and safeguards in place when they host or process data belonging to their customers.  Yardi also communicated this information to several mutual customers of Yardi and Entrata, advising them of the new restrictions Yardi would be placing on its third-party vendors.  To assure Yardi that Entrata's Point Solution Products were indeed SAS70 compliant, and to avoid any disruptions for their mutual customers, Entrata executed a letter agreement with Yardi in early 2009.  That letter provided Entrata's confirmation of SAS70 compliance documentation, including the specifics of how Entrata integrates with Yardi's database.

39.    Upon information and belief, in November 2009, Yardi's CEO, Anant Yardi, instructed his software developers to decompile the Entrata custom integration to obtain its source code.  This was done without Entrata's knowledge or approval, and in direct violation of the 2006 NDA.  Further, on information and belief, Mr. Yardi ordered his employees to place the decompiled Entrata source code from the utility in a folder on his desktop for ease of access and review.  On information and belief, Mr. Yardi later reviewed Entrata's source code, questioned its accuracy, and met both internally with four high level Yardi employees and with at least one mutual customer of Yardi and Entrata to review the code.  Additionally, Mr. Yardi admits that decompiling the Entrata code violated the 2006 NDA.

40.    As a consequence of Yardi's calculated breach of the 2006 NDA, Entrata has been harmed and continues to be harmed.

/ / /

**D.** **Yardi's Unlawful Efforts to Stifle Competition**

41.    Despite their longstanding and mutually beneficial business relationship, Yardi began to fear the growing success of Entrata's Point Solution Products, which illuminated to customers and to the market as a whole the deficiencies in Yardi's own interface software products (*i.e.*, Yardi's Plug-In Products) and allowed Entrata to create strong relationships with Yardi's property management customers.

*False Messages to Customers and Yardi's Suit Against Another Software Company*

42.    Although Yardi had previously and for several years been more than happy to encourage an ecosystem of software developers (including Entrata) to invest in creating complementary software products that enhanced the value of the Yardi core accounting software (like the Entrata Point Solution Products), Yardi began to change course as early as 2008-2009 as those firms began to mature and Yardi sensed a potential threat to competition.

43.    Because Entrata has been successful in developing products that offer tremendous quality and value for property management firms, it offers the greatest competitive challenge to Yardi's dominant position in the core accounting management market and therefore was the target of some of Yardi's most vicious anticompetitive conduct.  Among other things, Yardi began sponsoring false messages that its core property management accounting software (Voyager) could not functionally integrate with Entrata's Point Solution Products.  Yardi also continued to falsely accuse Entrata of engaging in a practice known as SQL injection (thereby creating security vulnerabilities) and not being SAS70 compliant.  Yardi's allegation of SQL injection was particularly inflammatory and damaging as news and industry reports routinely mention the practice as a source of security vulnerabilities and one particularly connected with

19

well-known data breaches involving the Wall Street Journal, WordPress, and Sony.  Yardi

communicated this false and misleading information to scores of both current and prospective

customers of Entrata.  To demonstrate the falsity of Yardi's communications, Entrata offered to

allow either Yardi's or customers' auditors to come onsite to Entrata to review its custom

integration processes, but Yardi declined.

44.     Yardi also systematically attacked other software providers that posed a current or

potential future competitive threat.  For example, on January 24, 2011, Yardi filed a copyright

infringement lawsuit against RealPage, Inc., another competing provider of property

management accounting software and associated plug-in or portal products.  After that lawsuit

was filed, Yardi held a conference call with its third-party vendors of integration software,

including Entrata, to assure them that, despite the lawsuit, Yardi still remained supportive of

collaboration and integration.

45.     Several mutual Yardi and Entrata customers became concerned that Yardi would

be successful in its efforts to lock out Entrata and render the Entrata integrations useless.  At

those customers' insistence, Yardi entered into agreements with several of them, assuring

customers it would continue to allow the custom integration and would notify them before it took

any steps to unilaterally disable the Entrata custom interface.  On at least one occasion, Yardi

assured that it would provide 60-days' notice prior to the discontinuance of use of Entrata's

custom integration.

46.     In the summer of 2012, Entrata launched Entrata Core, its core accounting

database product.  In reaction, and despite previous assurances of collaboration, Yardi—out of

recognition of Entrata's direct competitive threat to Voyager with Entrata Core and in order to

eliminate that threat—began ramping up its efforts to interfere with competition on the merits

and with Entrata's ability to sell its Point Solution Products to Yardi customers, falsely informing

customers that Entrata's interfaces with Yardi's software presented security problems and that the

Entrata's interfaces did not meet Yardi standards.

47.     Once again, Entrata presented one of—if not the—most powerful competitive

threats to Yardi's dominance and therefore was a victim of Yardi's most aggressive

anticompetitive tactics.  But Entrata was not alone; Yardi also began implementing tactics designed

to prevent its customers from freely integrating with any and all third-party vendors via a custom

interface, not just Entrata.  For example, in a March 3, 2015 email, Yardi notified its customers that

the most recent version of its dominant Voyager software will not allow the transmission of

"encrypted data . . . through third-party software that relies on a custom interface application."

Yardi then specifically noted in an e-mail to customers on May 15, 2015 that it would "no longer

host custom interface applications for new multifamily Voyager clients" and that ". . . custom

interfaces are no longer a viable long term option."

48.     In August 2012, Yardi wrote to its customers indicating it would no longer

support Entrata's custom interfaces, falsely claiming that Entrata's Point Solution Products

created security issues for customers' data, and encouraging customers to use Yardi's products

and standard interfaces instead.  Yardi's strategy has no legitimate business rationale, and has the

effect of reducing the functionality of products offered by Yardi's competitors (including but not

limited to Entrata), thereby reducing the overall quality of products in the marketplace, reducing

customer choice, and increasing costs.

/ / /

49.     Also in 2012, Yardi began communicating that it would start charging vendors, including but not limited to Entrata, $25,000 to use each of seven Yardi standard interfaces (for a total of $175,000 per year, per vendor, for access to all of Yardi's standard interfaces).  Yardi's strategy raised its rivals' costs (including but not limited to Entrata) and increases long run costs to customers.

50.     At that time, Entrata was interested in the possibility of adopting a number of Yardi's standard interfaces, and for that reason executed a third Non-Disclosure Agreement with Yardi (the "2012 NDA").  Similar to the 2006 NDA, the 2012 NDA required, among other things, that each party agree not to modify, reverse engineer, duplicate, simulate, decompile, create derivative works from, or disassemble the other party's software programs without the other party's prior written consent.  The parties further agreed not to use the other party's Confidential Information "to the detriment of or in competition with the other party."

51.     Entrata and Yardi began negotiating a "Yardi API Agreement" in December 2012.  Entrata also provided Yardi its own "Property Solutions API Agreement" to allow Yardi to integrate with Entrata Core.  Entrata provided Yardi a "gap analysis" that identified the additional functionality Entrata's custom interfaces provide over Yardi's standard interfaces. The analysis was provided to help ensure common Yardi and Entrata customers would not lose functionality as a result of a move to a standard interface.  Negotiations between the parties continued for some time, but ceased in February 2014 when Yardi notified Entrata that it would no longer negotiate.

/ / /

/ / /

52.     As recently as May 2015, Entrata has reached out to Yardi and requested the specifications for Yardi's standard interfaces.  Yardi, however, has denied or delayed Entrata's requests in furtherance of its anticompetitive behavior.

### *Yardi's Lawsuit against Entrata*

53.     On October 21, 2013, Yardi commenced a lawsuit against Entrata in the United States District Court for the Central District of California (the "California Lawsuit"), alleging various claims against Entrata, including copyright infringement and trade secret misappropriation, arising from Entrata's collaboration with Yardi over the years to develop a suite of Yardi-integrated interface products.  From the commencement of the California Lawsuit through the present, Yardi has used the California Lawsuit as a marketing vehicle, even going so far as to dedicate a portion of the Yardi website (http://www.yardi.com/news/yardi-lawsuit-against-property-solutions-international/) to selected Yardi press releases and links to legal documents related to the California Lawsuit.  Entrata believes the California Lawsuit was filed by Yardi to injure Entrata, and as a weapon to impair Entrata's ability to fairly compete with Yardi.

54.     When Yardi filed the California Lawsuit, it informed existing and potential customers that it would continue to work with Entrata to support their mutual customers, similar to announcements made following Yardi's initiation of the litigation against Real Page.  But contrary to Yardi's assurances, and although the two companies have over 200 joint customers, Yardi again began publicizing that Entrata was not an approved vendor, and employing other tactics to dissuade customers from purchasing, or continuing to use, Entrata products.  These

tactics have been part of a scheme by Yardi to coerce Entrata's current and prospective clients to use Yardi products rather than Entrata products.

55.     When questioned about these tactics by prospective and/or mutual customers, Yardi's typical response has been to tell them that because of the California Lawsuit (which it strategically commenced) Yardi cannot confirm whether it will continue to permit Entrata's Point Solution Products to interface with Yardi's accounting software products (primarily Voyager), and that there is no guarantee custom integrations will remain supported for the most recent Voyager versions 6.0 or 7S.

56.     Yardi has also told prospective and/or mutual customers that Entrata's custom integrations do not function with Voyager version 7S, which is false and misleading, in order to (a) frighten and persuade customers, on the basis of demonstrably false information, to move off of Entrata's Point Solution Products and onto Yardi's Plug-In Products, or (b) frighten and persuade potential customers, on the basis of demonstrably false information, not to license Entrata's Point Solution Products if they are considering doing so.

### Yardi's Further False Assertions and Acts Aimed at Stifling Competition from Entrata

57.     On or about January 6, 2015, Entrata received requests for technical support from several Yardi-hosted customers unable to access their data on Yardi's servers.  Upon investigation, Entrata discovered that Yardi's servers were not inaccessible, but instead that Yardi—in violation of both the 2006 NDA and the 2012 NDA—had rendered Entrata's custom integration utility inaccessible, thereby cutting off the transfer of data to and from their Yardi-hosted customers' Entrata Point Solution Products.  In particular, a specific file within the

integration utility (the "diagnostics.asmx" file) had been modified, removed, renamed, or otherwise rendered inaccessible to Entrata.

58.     Entrata is informed and believes that Yardi purposefully modified, removed, renamed, or disabled the diagnostics.asmx file located within Entrata's custom interface files—thereby preventing the transfer of data between Voyager and Entrata's Point Solution Products.

59.     Yardi's disabling of customers' ability to access their data stored in Yardi's database through the interface with Entrata's Point Solution Products so upset the affected customers that they complained to Yardi, causing it to temporarily restore at least some of the functionality of the Point Solution Products.

60.     This temporary respite did not last.  Instead, sometime in the early morning hours of January 14, 2015, and without prior notice to Entrata or the joint customers of Yardi and Entrata, Yardi again purposefully modified, removed, renamed, or disabled the diagnostics.asmx file in Entrata's integration utility.

61.     Later on January 14, 2015, Yardi contacted Entrata by e-mail, and then separately contacted Entrata's and Yardi's mutual customers by e-mail, with an announcement confirming that Yardi had taken affirmative steps to block portions of Entrata's integration utility's ability to function properly (the "Yardi January 14 Announcement").

62.     The Yardi January 14 Announcement was sent by Yardi's Vice President and General Counsel, Arnold Brier, with the subject line "Notice of Action by Yardi to Resolve Two Custom Interface Cybersecurity Vulnerabilities."  The full text of the Yardi January 14 Announcement is set forth below:

> Yardi regularly monitors and assesses potential security vulnerabilities as part of our cloud operations.  We are taking steps immediately to close two

cybersecurity vulnerabilities that are present in some third party vendor custom interface applications:  (1) SQL injection; and (2) the ability to arbitrarily modify software code in the Yardi cloud.  These changes will help improve database security by reducing the potential for a malicious cyberattack.

Yardi's standard interface application is used by the vast majority of third party vendors for the exchange of information between a client's database and the third party vendor's software.  Our standard interface application, which is developed, maintained and supported by a dedicated Yardi team, does not allow SQL injection or the arbitrary modification of code in the Yardi cloud.  A much smaller group of third party vendors uses its own custom interface applications to exchange data between a client's Voyager database and the vendor's software.  Custom interface applications are not written, maintained or supported by Yardi.

**Effective immediately Yardi will take steps to block any known instances of SQL injection in any custom interface application, and will disable the ability to arbitrarily modify custom interface application software code in any Yardi cloud environment (including making modifications to dynamic-link library (.dll) files).** [Emphasis in original.] These changes apply to all custom interface applications in the Yardi cloud—**<u>including the Property Solutions custom interface, which is known to use SQL injection and to make .dll modifications without notice</u>**. [Emphasis supplied.]  We do not believe this action will impact the core functionality of any third party custom interface, but closing these security vulnerabilities will help increase cybersecurity and the protection of your database.

If you do experience any technical issues, please contact your third party vendor.  A Yardi team is also standing by to do what it can to help and can be reached directly by calling (855) 219-7147.  If you have any other questions, please contact me at (805) 699-2040 x1769 or Arnold.Brier@Yardi.com.  We value you as a Yardi client and thank you for your continued support.

Sincerely,

Arnold Brier
Vice President and General Counsel

63.     Separately, also on January 14, 2015, Mr. Brier contacted Entrata's Chief Legal

Counsel, Jared Hunsaker, with an e-mail confirming Yardi's intent to block Entrata's custom

interface software.  Mr. Brier's e-mail is set forth below in its entirety:

> Please note that effective immediately Yardi will take steps to block any
> known instances in any custom interface applications that use SQL
> injection, and will disable the ability to arbitrarily modify software code in
> any Yardi-cloud environment through a custom interface.
>
> Going forward, Yardi will also require confirmation from all custom
> interface developers and operators that they do not use SQL injection in any
> custom interface application in the Yardi cloud. These changes are intended
> to improve database security by reducing the possibility for a malicious
> cyberattack through these potential vulnerabilities.
>
> Please contact me if you have any questions.
>
> Best regards,
>
> Arnie

64.     As Yardi well knows, and no doubt intended, the term "SQL injection" is laden

with negative connotations, as described above in ¶ 43 above.  It is ubiquitously used in the

industry to refer to a code injection technique used to attack data-driven applications, in which

*malicious* SQL statements are inserted into an entry field of an SQL database for execution (*e.g.*,

to dump the database contents to the attacker).  Entrata *does not* engage in SQL injection, as that

term is roundly understood by the industry.  And Entrata has *never* used its integration with

Voyager or any Yardi software to replace, tamper with, or alter the functionality of Voyager .dll

files.  However, because Entrata's custom interface software is (for its cloud-based "software-as-

a-service" ["SaaS"] customers) housed on Yardi servers, it must, in order to function at all,

access Yardi's SQL databases.

65.    The fallout from Yardi's actions against Entrata's Point Solution Products and from the propagation of the Yardi January 14 Announcement was immediate and far-reaching for Entrata.  That morning, and for several days thereafter, Entrata was inundated with fearful calls and e-mails from its customers and prospects, regarding the abrupt loss of functionality in their products and also inquiring once again about Yardi's false allegations that Entrata makes use of SQL injections.  Yardi's actions immediately began to distort competition and insulate Yardi's products from the competitive threat posed by Entrata.

66.    Customer reaction demonstrates that Yardi's conduct was damaging to competition and customers, and also that Yardi's actions were irrational but for the fact that they had the anticompetitive effect of protecting Yardi's dominance.  For example, one mutual customer, having received the Yardi January 14 Announcement, contacted Yardi to advise that Yardi's actions appeared to be a calculated effort to block Entrata's integration specifically, and thus constituted a breach of the notice provision of its contract.  The customer further demanded that if Yardi's actions were not in fact deliberately targeting Entrata, then Entrata's custom interface software should be "whitelisted"[1] to allow full functionality and utility.

67.    On January 15, 2015, Entrata notified Yardi of its concerns regarding Yardi's actions and the Yardi January 14 Announcement by means of a "cease and desist" letter from Entrata's Mr. Hunsaker to Yardi's Mr. Brier ("Entrata's January 15 Notice Letter"), the contents of which are as follows:

> Re:    Yardi's Anti-Competitive Conduct and False Statements about
>        Property Solutions

---

[1] A "whitelist" is a list of computer software applications that have been granted permission by the user or an administrator.  When an application tries to execute, it is automatically checked against the list and, if found, allowed to run.

Dear Mr. Brier:

Yesterday morning, Property Solutions learned that Yardi disabled elements of Property Solutions' integrations, and those integration elements need to interact with the Voyager software.  Property Solutions also learned that Yardi, through public written communication, is telling mutual customers that the integrations engage in SQL Injection and make modifications to Yardi's or others dynamically linked libraries (.dll's).

Yardi's reckless decision to partially cripple the integrations' access to Voyager without any notice to Property Solutions and Yardi's mutual customers is causing those customers, and Property Solutions, serious harm and disruption. For example, Yardi has impeded mutual customers' ability to track work orders or manage leads in the manner which they need to operate their businesses effectively.

We understand that many of Yardi and Property Solutions' mutual customers were concerned about such an action and asked for their license agreements to include language which guaranteed their ability to use Property Solutions' custom integrations, or at least notification before any access was terminated.  We believe that Yardi's reckless decision to disable Property Solutions access is a breach of those agreements.   Yardi's unilateral decision to partially disable Property Solutions' integration access to Voyager without notice also constitutes actionable anticompetitive conduct.   We demand that you immediately and publicly restore the integrations' prior functionality.  This is critical, as it is causing problems with Property Solutions continuing obligations to its customers in respect to the ability to patch and update security vulnerabilities in its software.

Yardi's assertion that Property Solutions engages in "SQL Injection" is demonstrably false and defamatory.  The term "SQL Injection" refers to a security vulnerability in which malicious SQL statements are inserted into a data-entry field for execution.  Property Solutions' products, like Yardi Voyager and most database applications use the SQL language to connect to a database, but they do not engage in, or allow, SQL Injection.  Your statement implies that Property Solutions is engaging in malicious, reckless, or even possibly criminal behavior.   We therefore demand that you immediately and publicly retract your allegation that Property Solutions engages in SQL Injection.

Yardi also insinuated in their public communication that Property Solutions modifies Yardi or others .dll files. This language was vague and infers that Property Solutions has modified Yardi's .dll files, which is demonstrably

29

false and defamatory.  Property Solutions has never modified Yardi's .dll files. Again, we demand that you immediately and publicly withdraw your allegation and clarify that Property Solutions does not modify Yardi's .dll files.

Yardi's decision to use its customers as pawns in its ongoing dispute with Property Solutions is causing them significant harm.  Property Solutions will take whatever legal actions it deems necessary to ensure that its customers can operate their business without interference.

Sincerely,

Jared Hunsaker

### *Yardi's Acts of Coercion against Entrata*

68.    Yardi's actions came without warning and stood to cause substantial damage to Yardi's competitors, including Entrata.  Thus, Entrata was forced to take immediate measures to comply with Yardi's demands in an effort to restore functionality for its customers.  These efforts have given rise to new customer complaints and functionality issues.  Some of the problems caused by Yardi's unilateral actions include impacting Entrata's ability to update the custom integration utility files and deploy timely fixes to any integration utility issues should they occur, and preventing access to interface logs, which protect customers against cyber-attacks and are otherwise important from a security standpoint.

69.    Without access to write to the file system, the Entrata integration utility cannot provide the same level of functionality or service, and Entrata's ability to resolve issues in the timely manner that its customers have come to expect has been limited.

70.    After Yardi unilaterally disabled portions of Entrata's custom integration, Yardi sent a "change management form" and demanded that Entrata execute the form for any customer upgrading the custom integration.  Yardi's CEO, Mr. Yardi, sent an e-mail to Entrata's CEO,

Dave Bateman, claiming that several clients had contacted Yardi about their issues and concerns about the custom integration, including problems with e-mails not going to residents when work order requests are closed, as well as problems with processing applications.  Mr. Yardi copied four of the parties' largest mutual customers' technical contacts on the e-mail thread, and mentioned that Entrata's Chief Legal Counsel, Mr. Hunsaker, had proposed modifications to the change management form.

71.     Because of the immense pressure and coercion that Yardi exerted on the Relevant Markets and Entrata in particular, its CEO, Mr. Bateman, reluctantly agreed to sign the new form notwithstanding the fact that the language in the form clearly misrepresented the issues ("2015 Integration Form").

72.     While acquiescing to Yardi's demand to execute the form has alleviated the immediate problems with the installation of the custom integration, it has slowed down the process immensely, thereby furthering Yardi's obstructionist efforts and making it more difficult and costly for Entrata to offer its software products that are either competitive with Yardi's core accounting software or complementary to Yardi's core accounting software.

73.     As a result of Yardi's anti-competitive behavior and publication of false and misleading statements about Entrata and its Point Solution Products, a number of Entrata's existing customers have either terminated or threatened to terminate services and move to Yardi products, or, in the case of prospective customers, have been too hesitant and unsure of the continued ability of Entrata and Yardi to maintain the functional integration of Entrata's Point Solution Products.  As a consequence of Yardi's calculated anti-competitive conduct, the market for the sale of integration products is manifestly less competitive, and that reduction in

competition has harmed, and continues to harm, customers and competing suppliers, including Entrata. For example, Entrata has lost business as described in ¶ 88 below. So, too, both competition and consumers in the Accounting Product Market and the market for specialized integration or plug-in products for property management accounting software (*i.e.*, the "Integration Product Market" defined in ¶ 96 below) have been harmed by Yardi's arbitrary decision to hinder third parties' ability to develop and market functional integrations with its dominant Voyager core accounting and property management database software.

74.     At Yardi's request, Entrata began completing and submitting a 2015 Integration Form each time Entrata either (a) contracted with a new mutual Entrata / Yardi customer; or (b) was notified that a mutual Entrata / Yardi customer required an update to the integration utility installed on its test or live database.

75.     On or about February 12, 2015, Yardi generally responded to Entrata regarding the still pending utility installation requests, requesting information, in addition to the submitted 2015 Integration Forms, related to Entrata's testing and maintenance of its integration utility.

76.     Entrata adequately responded to Yardi's request for additional information, but Yardi continued to refuse to act on the still pending utility installation/update requests. Throughout March and April, 2015, Entrata and Yardi exchanged several letters wherein Entrata responded to Yardi's requests for additional information and Yardi continued to repeatedly ask the same questions, despite having sufficient answers in its possession.

77.     On information and belief, and upon Yardi's receipt of Entrata's responses to its requests for additional information, Yardi began setting up telephone calls and/or in-person meetings with each of the clients waiting for Yardi to act on their 2015 Integration Form

32

requests, again calling into doubt the security and practices of Entrata and its methods of testing and maintaining its custom integration.

78.     Between the months of January 2015 and May 2015, Entrata submitted 2015 Integration Forms for mutual Entrata / Yardi customers.

79.     On or about April 28, 2015, and in the subsequent days, Yardi sent letters to several clients (the "April 28 Letters") with pending installation or update requests.  The letters stated in part that each client's request had been pending "while Yardi has, since February 12, sought additional information from Property Solutions…" and that Yardi would "like to move forward" with the pending requests, but in order to do so, Yardi's new requirement was that each client re-certify that it would "abide by the terms of [it's] Voyager software license agreement" which, among other things, prohibits clients from "giving access to any third-party (including Property Solutions)," and to "accept the risk of using the Custom Interface with the Voyager software."

80.     The April 28 Letters also required that Entrata sign an additional form for each Yardi client, (the "Supplemental Acknowledgement"), which required Entrata to acknowledge, among other things, that it would not use or access any Yardi-owned databases; use or access any third-party and/or client owned Voyager databases to test the custom interface without the owner's permission; and would not use or access any Voyager software to test or validate the custom interface.  Although each client was required to agree and affirm certain information as described in ¶ 79 above, the Supplemental Acknowledgment was only required to be signed by Entrata.

33

81.     Yardi also noted, both in the April 28 letters, and in the Supplemental Acknowledgment that neither the authorization and agreement of the mutual customer, nor the execution by Entrata of the Supplemental Acknowledgement would require Yardi to host the custom interface for any other client, or preclude Yardi from discontinuing the use of all custom interfaces in the future.  Additionally, Yardi stated that the solution would not change Yardi's "previously announced data security plans, which will impact all non-standard interfaces," including the client's use of Entrata's custom interface.

82.     Entrata and Yardi continued to exchange redlined versions of the Supplemental Acknowledgement in an effort to facilitate utility updates and/or installations and ensure the continued functionality of the integration for mutual customers.  For several months, Yardi refused to install or update any utility, or exchange specifications for the standard interface until such a time as the Supplemental Acknowledgement was fully agreed upon and executed.  On information and belief, this was yet another of Yardi's anti-competitive tactics to harm competitors.

83.     On or about September 16, 2015, and after several rounds of negotiation, Entrata and Yardi reached an agreement that allows integration utilities to be updated and installed for mutual Entrata / Yardi Customers without submitting the Supplemental Acknowledgment. The new process requires Entrata to submit a Vendor Software Change Request when requesting an update to a Yardi utility, or a Hosted Software Request (collectively referred to as "Request Form(s)") when requesting the installation of a Yardi utility.

84.     Yardi has refused to install integration utilities for new Entrata / Yardi customers. Similarly, in many cases, when the property manager changes from one mutual Entrata / Yardi

client (*i.e.*, a user of Yardi's core accounting software and Entrata integration utilities) to another, Yardi has refused to maintain integrations for those properties once they have moved to the new client's databases.

85.    In November 2015, Yardi sent another letter to its customers, notifying them that after August 31, 2018, Yardi would "no longer host, with respect to multifamily portfolios the custom Third Party Application(s) described in [client] Agreement[s]." The letter also stated that Yardi "work[s] closely with many exceptional vendors that use [Yardi's] standard interface rather than a custom interface" and that clients "may choose one of these vendors or a solution that does not require a custom interface" prior to August 31 2018.

86.    On December 1, 2015, Mr. Brier emailed Mr. Hunsaker, notifying him that Yardi has no plans to allow Entrata to join the Yardi Standard Interface Program.

87.    On information and belief, Yardi will also discontinue hosting custom third-party applications owned and created by companies other than Entrata after August 31, 2018, and other third-party vendors are also being barred from joining Yardi's Standard Interface Program.

88.    The purpose of Yardi's agreements, requirements, letters and "notices" to customers is to force or coerce customers of Yardi's Voyager product, over whom Yardi has unquestioned market power as described in ¶¶ 96-108 below, from purchasing or utilizing non-Yardi (including non-Entrata) integration products.  As a result of Yardi's anti-competitive behavior, a number of Entrata's existing customers have either terminated or threatened to terminate services and move to Yardi products or, in the case of prospective customers, have been too hesitant and unsure of the continued ability of Entrata and Yardi to maintain a functional integration to use Entrata's Point Solution Products.  Those who have attempted to use

Entrata's products have been barred from integrating by Yardi's calculated and anti-competitive conduct.

89.     As a consequence of Yardi's calculated anti-competitive conduct and interference with Entrata's existing and potential economic relations, Entrata has been harmed and continues to be harmed in its business and in its ability to provide true competition to Yardi.

90.     Yardi's conduct has no legitimate business rationale; its professed "security concerns" are a false pretext, and Yardi's conduct in fact jeopardizes the security of customer data.  Yardi's conduct only has the effect of reducing the functionality of products offered by Yardi's competitors (including but not limited to Entrata), thereby reducing the overall quality of products in the marketplace, reducing customer choice, and increasing cost.  Notably, Yardi's conduct even reduces the value to customers of Yardi's own core accounting software by limiting the usefulness of applications that provide additional or complementary functionality.  It would be irrational for Yardi to act in such a manner but for the anticompetitive impact of its conduct and the long run strategy of preserving its existing dominance in core accounting software and extending that dominance to integration products.

91.     This stifling of competition in the in the Accounting Product Market and the market for specialized integrated or plug-in products for property management accounting software (*i.e.*, the "Integration Product Market" defined in ¶ 96 below) harms both competition and consumers.  That harm is being deliberately caused by Yardi in order to perpetuate its monopoly over the Accounting Product Market and to develop a monopoly in the Integration Product Market.

/ / /

***Yardi's Continued Acts Aimed at Injuring***
***Entrata and other Third-Party Integrators***

92.     On or about March 3, 2015, Yardi e-mailed, at a minimum, all mutual Entrata /

Yardi customers—but on information and belief, also copied shared clients with other

competitors—outlining changes to the way Yardi would be encrypting certain data beginning in

the third quarter of 2015.  The contents of the March 3 e-mail follow:

> Yardi Clients with Residential Properties,
>
> Within the past year, malicious cyberattacks on retailers, banking institutions, and health care providers have compromised the personal and financial information of hundreds of millions of Americans.  The safety and security of client data has always been of paramount concern to Yardi, and we work tirelessly to guard against improper data disclosures.  As part of the ongoing effort to improve the security of our hosted environment and to add to the many protections that Yardi already uses, beginning in the third quarter of 2015, we will encrypt certain financial and personal information in Yardi Voyager® 7S databases hosted in the Yardi Cloud.
>
> The encryption functionality will be available at no additional charge to Voyager 7S clients with residential properties, including clients who exchange data with third-party software using Yardi's standard interface.  However, the encrypted data will not be available through third-party software that relies on a custom interface application.  Clients can continue to use such third-party software but will need to accept the risks that may be associated with maintaining unencrypted sensitive data in their Voyager 7S database.
>
> If you have questions about whether your third-party software uses a custom interface please contact your vendor.  We are also available to answer your questions and discuss how this new level of security can benefit you, so please do not hesitate to contact me or your account manager.
>
> Sincerely,
>
> Arnold Brier
> Vice President, General Counsel

37

93.     On March 24, 2015, Entrata's general counsel, Mr. Hunsaker, sent an e-mail and a letter to Mr. Brier asking whether Yardi was willing to work with Entrata to ensure that all mutual client data is adequately protected and secure, in response to the message Yardi sent to the marketplace regarding the encryption of certain data beginning in the third quarter of 2015. On April 2, 2015, Mr. Hunsaker sent another e-mail and letter to Mr. Brier, as Mr. Brier did not respond to the first (March 24) communication.  Mr. Hunsaker's April 2 letter, among other things, generally reiterated Entrata's request to install the utility for the then pending customers, and again requested that Yardi exchange decryption keys with Entrata.

94.     Yardi responded that it would not exchange decryption keys, but instead would "continue to implement additional security measures…," and that it was uncertain how those additional security measures would "impact the functionality of custom interfaces."

95.     Additionally, Yardi has communicated to the market in writing, as recently as May 15, 2015, that "[c]ustom interfaces cannot be developed, validated or supported without access to Yardi Voyager, and we are frequently called upon to help fix data corruption issues created by custom interfaces.  Based on these issues and other security considerations, custom interfaces are no longer a viable long term option.  Consequently, Yardi will no longer host custom interface applications for new multifamily Voyager clients …."  In 2015 and 2016 alone, Entrata had deals in the pipeline with well over 70 clients—some prospective, and some already mutual customers—representing over $5.1 million in new annual contract value for Entrata.

/ / /

/ / /

/ / /

E.    **Relevant Markets and Yardi's Market Power**

96.    As outlined above, there are separate and distinct product markets for (a) core property management accounting software products (such as Yardi Voyager) used in the multi-family housing industry in the United States by "enterprise"-sized property management companies, which typically manage at least 1,000 units ("Core Accounting Products" or the "Accounting Product Market"), and (b) "plug-in" or portal special purpose software products (such as Entrata's Point Solution Products) that integrate or interface with the Core Accounting Products ("Integration Products" or the "Integration Product Market") in the United States. Those pieces of software are distinct, sold separately, and serve different functions for property management customers.  As described above, Core Accounting Products serve back-end database functions while Integration Products are purchased to access and utilize the data stored in the Core Accounting Product databases.  As also described above, customers of one company's Core Accounting Products (most typically Yardi's Voyager, as the dominant platform in the industry) will often use an unrelated company's integration software (*e.g.*, Entrata's Integration Products).

97.    The relevant geographic market is the sale of both Accounting Products and Integration Products in the United States.  Market participants source such software domestically (*i.e.*, within the United States) in order to, for example, ensure that it is compatible with domestic industry practices and applicable accounting rules.  Accordingly, U.S. customers for Accounting Products and Integration Products are able to source such products within the United States, either from domestic companies or from foreign companies selling software in the U.S.  There are no international companies that offer equivalent competitive Accounting Products and

Integration Products that have any substantive share of the U.S. market.  Also, there are very few

U.S. based companies that offer Accounting Products and Integration Products internationally.

98.     Core Accounting Products constitute a separate relevant product market because

those products provide unique, specialized functionality and tools required by property

management customers with significant data volumes and complex needs that arise from

managing properties with a large number of units (1,000 and over).  For example, the ability to

handle the large volumes of data and multiple fields required by property managers with a large,

as opposed to a small, number of units.  Other pieces of software (such as Intuit Quickbooks,

Buildium, Appfolio, PropertyWare, Rent Manager, and TenantPro, among others) serve a similar

function for customers managing single-family properties or a small number of multi-family

units.  Participants in the Accounting Product Market (including Yardi) recognize the different

demands of property managers based on the number of units involved.  For example, in a press

release announcing its acquisition of a company called DIY, it was noted that "[t]he acquisition

allows Yardi to offer an integrated, web-based property management system designed for

companies that manage 1,000 or fewer units."  Because of these specific features and the

functionality described above, property management customers with a large number of units

(1,000 and over) would not switch to other alternative, less complicated accounting software

products even if the price of Core Accounting Products were to increase because those

alternative products do not offer the necessary functionality.  Accordingly, other more basic

property management software is not a substitute for Core Accounting Products.

99.     There is also differentiated and specific demand for Core Accounting Products

that cannot be satisfied by other types of software or other generic accounting software and

database products because such products do not offer the specific and critical features and functionality demanded by property management companies and cannot be easily or readily customized to offer such functionality.  Such features include, for example:  use of real-estate and property management specific nomenclature, data types and data fields; accounting for and managing tenant deposit funds; accounting for and presenting data that involves the inter-performance of both the general ledger and the resident/tenant ledger; and the management of other types of data unique to the real estate and property management industry.  Those other types of data include information regarding intercompany relationships, specialized methods of addressing percentage ownership of properties or assets and partnership distributions and reporting, common area maintenance funds, expense reconciliations and real estate asset valuations.  General accounting and database software, even sophisticated software applications such as those provided by SAP and Oracle, are not designed to and do not address these needs.  Accordingly, property management customers with a large number of units (1,000 and over) would not switch to sophisticated but non-industry related accounting and database software products because they lack, among others, the features described above, even if the price of Core Accounting Products were to increase because those alternative products do not offer the necessary functionality.  Accordingly, the market for Core Accounting Products is both distinct and relevant, without adequate substitutes.

100.     Upon information and belief, while a number of other companies, including Entrata, have developed and sell Core Accounting Products, Yardi has long held and continues to hold a dominant and controlling position in the Accounting Product Market with its Voyager product line, with a market share of at least 60% of those property managers with portfolios

greater than 1,000 units.  Yardi is also described by analysts as having "the largest [property

management] user community in the industry."  It is important to note that Yardi's power in the

Accounting Product Market derives not only from its overwhelmingly dominant share of the

market compared to other providers of Core Accounting Products (Real Page with approximately

26%, MRI with approximately 9%, AMSI and others, including Entrata with approximately a 6%

split between them), but also from the high degree of difficulty and expense associated with

switching from one Core Accounting Product provider to another.  Making such a switch

requires customers to undertake a time-consuming and expensive data-migration process and

incur additional license fees associated with new products.  Switching to new software can also

cause a company to suffer severe and costly disruption to its ordinary business as a result of the

time required to transfer information between databases, ensure the software's compatibility with

its existing IT systems and customer demands, train users, develop new processes, and recreate

any custom forms and reports required by a customer's specific business needs.  The cost of such

a transition can run into the millions of dollars.

101.    New companies are also unlikely to enter the Core Accounting Software market

due to the high costs and significant amount of time, experience, and market knowledge required

to create such a product.  Entrata is the only recent, viable, competitor to enter the Core

Accounting Software market, meaning that Yardi will send a strong signal to other potential

future entrants that competition is futile if Yardi's pattern of anticompetitive acts successfully

extinguishes the competitive threat from Entrata.

/ / /

/ / /

102.     Yardi's power in the Accounting Product Market is also demonstrated by its ability to coerce customers as well as potential and actual competitors, such as Entrata, in the adjacent market for Integration Products as described above.

103.     The products in the Integration Product Market constitute a separate relevant product market because those products provide specialized functionality to property management customers—distinct from the functionality provided by products in the Accounting Product Market.  For example, Integration Products provide varied and specific functions such as managing and tracking rent payment, tracking sales leads, handling lease applications, and managing resident services such as parcel tracking, utility metering/payment, and renter's insurance.  These functions are enabled by accessing data and information maintained in a Core Accounting Product, but such functions are not themselves available in Core Accounting Products.  While different Integration Products perform unique functions, and are not therefore substitutes for each other, Integration Products are often sold together in bundles or suites and Yardi's anticompetitive conduct affects all Integration Products in the same way (*e.g.*, by eliminating interoperability with Yardi's dominant Core Accounting Product) it is appropriate to treat the bundle of Integration Products as a single relevant product market.  Therefore, if subjected to a small but significant and non-transitory increase in price, customers in the Integration Products Market would not, and could not, switch from Integration Products to Core Accounting Products alone.  Accordingly, Core Accounting Products are not a substitute for Integration Products (either individually or as a bundle) and they constitute distinct markets.

104.     Alternatively, there may be separate and distinct relevant product markets (or submarkets) for specific types of integration products (*e.g.*, a specific software application to

manage lease applications or renter's insurance).  In each such case, Yardi's anticompetitive conduct is directed equally across such products in an undifferentiated way, with comparable injury to customers, competition, and competitors.

105.    Moreover, other types of generic workflow applications or software products or services that separately track and manage the various functions and services enabled by Integration Products (either collectively as a bundle or as individual software products) are not adequate substitutes for Integration Products because they do not offer the same functionality demanded by property management customers.  For example, such software products are unable to either (a) access or communicate with the database included in a Core Accounting Product and are therefore unable to interface with or update a customer's accounting system, critical to the generation of accurate and timely reports and business evaluation, or (b) manage key resident services (such as rent payment or utility metering) across different software products.  Those individual pieces of software also lack the uniform and consistent software architecture, design elements, commands, and tools available from Integration Products (either as a bundle or as individual software products).  Such siloed software does not fulfill the needs of property managers in the Integration Products Market, and those customers would not switch from Integration Products to such siloed software if subjected to a small but significant and non-transitory increase in price.  Accordingly, other custom or off the shelf software that does not integrate with Core Accounting Products is not an adequate substitute for Integration Products.

106.    Yardi and Entrata, along with other companies, compete in the Integration Product Market by selling bundles of Integration Products as well as individual software products that offer competitive, substitutable functionality (*e.g.*, a specific software application

44

to manage lease applications or renter's insurance). Though Yardi does not yet have a dominant position in this market (based on information and belief, Entrata estimates Yardi's share to be approximately 10%), its dominant position in the adjacent Accounting Product Market, combined with Yardi's, unfair, unlawful, and anti-competitive conduct (as described above), presents a dangerous likelihood that Yardi will succeed in acquiring a dominant market share in the Integration Product Market.

107.    In addition to those barriers to entry discussed above, new companies are unlikely to enter the Integration Product Market, and the development of new integration products is unlikely to be successful to any appreciable degree, due to the high costs and significant amount of time, experience with multiple software systems, and market knowledge required to create such viable Integration Products (as demonstrated by Entrata's approximately 10 years spent developing its suite of Integration products). Also, because an Integration Product requires interaction with a Core Accounting Product in order to function, a new market entrant would incur substantial licensing, connectivity, development, marketing, and other fees in creating viable Integration Products (either as a complete bundle or individual software products). Those difficulties would be greatly compounded by Yardi's anti-competitive leveraging of its dominant Voyager software (the largest in the Accounting Product Market and the beneficiary of a significant incumbency effect) to prevent other companies from offering viable Integration Products that are compatible with Voyager.

108.    Yardi has unquestionable market power over customers that are already "locked in" to its Voyager software due to the severe costs of changing from one Core Accounting Product to another. By changing policies to disallow Integration Products that it once supported,

after customers have already become locked-in to the Voyager product, Yardi is able to use its market power to force customers to alter their purchasing decision in the market for Integration Products. Yardi's intentional, unfair, and unlawful attempts to eliminate viable competition to its own Integration Products (by, for example, preventing competitive products from integrating effectively with its Voyager platform and raising its rivals' costs) creates a very real and dangerous propensity that Yardi will succeed and be in a position to dictate prices, reduce innovation, reduce customer choice, and ultimately reduce output in this market—particularly for those customers already using its dominant Core Accounting Product.

## IV.        CLAIMS FOR RELIEF

### FIRST CLAIM
### (*Injurious Falsehoods*)

109.    By this reference, Entrata incorporates each of the foregoing allegations.

110.    Yardi's assertions in the Yardi January 14 Announcement that Entrata engages in SQL injection and arbitrary alteration of Yardi .dll files in the Yardi Voyager code are false.

111.    Each of the injurious falsehoods described above (*i.e.*, those propagated by the Yardi January 14 Announcement, as well as those Yardi disseminated through other means) was and is calculated to prevent property owners, managers, and users of property management software from dealing with Entrata or using Entrata's software; and each interferes, to Entrata's disadvantage and detriment, with Entrata's relations with its customers—both current and prospective.

112.    Yardi intends, and recognizes or should recognize, that its publication of each of the injurious falsehoods described herein is likely to harm Entrata's pecuniary interests.

113.    On information and belief, the injurious falsehoods described herein have resulted in, among other things:  (a) Entrata losing customers; (b) Entrata not gaining prospective customers who otherwise would have engaged with Entrata, but for the injurious falsehoods disseminated by Yardi described herein; and (c) Entrata's current customers reducing or discontinuing their business with Entrata.

114.    Yardi has acted in bad faith and with malice in publishing the injurious falsehoods described above.

115.    Yardi knows or believes that each of the injurious falsehoods described above is false, or at least it has acted in reckless disregard of the falsity of its communications.

116.    Entrata has suffered irreparable harm as a consequence of Yardi's dissemination of injurious falsehoods, and Entrata will continue to do so unless and until Yardi is enjoined from publishing or otherwise disseminating injurious falsehoods, including the false implications and representations described above.

## SECOND CLAIM
### (False Advertising)

117.    By this reference, Entrata incorporates each of the foregoing allegations.

118.    Yardi, in interstate commerce and in commercial promotion of its Voyager and Plug-In Products, has made materially false or misleading representations of fact, including but not limited to those found in the Yardi January 14 Announcement accusing Entrata of engaging in SQL injection and alteration of .dll files in the Voyager code, as well as stating that newer versions of the Voyager application do not integrate with Entrata's Point Solution Products.

119.    The Yardi January 14 Announcement and Yardi's other false and misleading communications to the industry constitute commercial speech, in that they were made by Yardi

in connection with its offering a variety of software products that compete with those offered by Entrata. The Yardi January 14 Announcement and Yardi's other false and defamatory communications to the industry were made for the purpose of unfairly influencing consumers to stop using Entrata's Point Solution Products and Entrata Core, and to instead purchase and use Yardi's software products. The Yardi January 14 Announcement and Yardi's other false and misleading communications to the industry were disseminated to all or nearly all of the Yardi customers who, at that time, were using the Entrata Point Solution Products instead of Yardi's Plug-In Products. As a direct and proximate result of Yardi's January 14 Announcement and Yardi's other false and misleading communications to the industry, Entrata has suffered injury and damages.

120.    Yardi's false and misleading communications to the industry, including at least its statements in the Yardi January 14 Announcement asserting or implying that Entrata engages in SQL injection and modification of .dll files, constitute actionable false advertising under 15 U.S.C. § 1125(a)(1)(B) [Section 43(a)(1)(B) of the Lanham Act].

121.    Yardi's false and misleading communications to the industry, including at least its statements in the Yardi January 14 Announcement asserting or implying that Entrata engages in SQL injection and modification of .dll files, were made by Yardi with malice based on actual knowledge of their falsity, or with reckless disregard for their truth or falsity.

122.    Entrata has suffered irreparable harm as a result of Yardi's false and misleading communications to the industry, and Entrata will continue to do so unless or until Yardi is enjoined from stating or implying that Entrata's custom Yardi interface engages in or allows SQL injection and/or alteration of .dll files in the Voyager code, and from otherwise

disseminating false and misleading communications to the industry about Entrata and its

products.

123.    By reason of the foregoing, Entrata is entitled to injunctive and monetary relief,

including treble damages and attorneys' fees, pursuant to, at the least, sections 34, 35, and 43 of

the Lanham Act, 15 U.S.C. §§ 1116, 1117, and 1125.

**THIRD CLAIM**
**(*Violations of Utah Truth In Advertising Act*)**

124.    By this reference, Entrata incorporates each of the foregoing allegations.

125.    By representing, in the course of its business, that Entrata's custom interface

allows SQL injection and changes to .dll files, and that newer versions of the Voyager

application do not integrate with Entrata's Point Solution Products, Yardi has engaged in

deceptive trade practices under Utah Code § 13-11a-3(1), subdivision (e).

126.    By causing, in the course of its business, dissemination of the Yardi January 14

Announcement and the false statements contained therein, Yardi has disparaged the business and

services of Entrata, and has thus engaged in deceptive trade practices under Utah Code § 13-11a-

3(1), subdivision (h).

127.    By way of Entrata's January 15 Notice Letter, Yardi was afforded notice more

than 10 days prior to the filing of the complaint that initially commenced this Action of the false

nature of Yardi's representations that Entrata's custom interface allows SQL injection and

changes to .dll files, and has received a demand by Entrata that Yardi take steps to cure the false

representations.

128.    Despite notice of the foregoing, received more than 10 days prior to the filing of

the complaint that initially commenced this Action, Yardi has failed to promulgate correction

49

notices by the same media and with the same distribution and frequency as its deceptive advertising.

129.     By reason of the foregoing, Entrata is entitled to injunctive and monetary relief, including attorney's fees and an order requiring Yardi to promulgate corrective advertising, pursuant to Utah Code § 13-11a-4.

### FOURTH CLAIM
### (*Tortious Interference*)

130.     By this reference, Entrata incorporates each of the foregoing allegations.

131.     Yardi has intentionally interfered with Entrata's existing and potential economic relations by directly contacting all or nearly all of Entrata's customers that use the Entrata custom interface with Yardi software.

132.     In doing so, by way of the Yardi January 14 Announcement and Yardi's other false and defamatory communications to the industry, Yardi has used improper means—including but not limited to intentionally, willfully, or recklessly making false representations that Entrata's custom interface allows SQL injection and changes to .dll files—to suggest that Entrata actively engages in both SQL injection and .dll modification.

133.     Yardi's actions in this regard have caused Entrata to lose customers and have thus caused injury and damage to Entrata.  In addition, Yardi's actions have caused, and will continue to cause, injury and damage to Entrata in that a growing number of its current customers has begun to question the long-term viability of the Entrata custom interface, as well as the ability of Entrata to work with Yardi in the future, and are thus considering moving away from Entrata's

Point Solution Products and toward Yardi's Plug-In Products, or other competitors' software, instead.  Entrata's potential customers are being dissuaded for the same reason.

134.    Yardi's actions in this regard have caused, and will continue to cause, injury and damage to Entrata in that vast amounts of employee time and effort have already been spent, and will continue to be spent, responding to customers and potential customers concerned about Yardi's accusations, and reassuring them of Entrata's long-term viability.

135.    Entrata has suffered irreparable harm and injury, and will continue to suffer irreparable harm and injury unless and until Yardi is enjoined from tortiously interfering with Entrata's business and economic relations.

### FIFTH CLAIM
### (*Monopolization and Attempted Monopolization of the Accounting Product Market*)

136.    By this reference, Entrata incorporates each of the foregoing allegations.

137.    Yardi provides Core Accounting Products and Integration Products used by property management customers in the multi-family housing industry, typically with at least 1,000 units.  On information and belief, Yardi's principal Core Accounting Product, Voyager, has in excess of a 60% share of the Accounting Product Market. Further, on information and belief, Yardi has profitably charged prices above the competitive level in the Accounting Product Market for a sustained amount of time.  As a consequence of the foregoing, Yardi wields market power in the Accounting Product Market.

138.    Along with a dominant share of the Accounting Product Market, Yardi also wields market power because of the extremely high costs, risk of business disruption and overhead a consumer will incur in order to migrate data and configure IT systems to switch to an

alternative Core Accounting Product provider.  As a result of its hold on the Accounting Product Market, Yardi has the ability to control prices and exclude competition.

139.    Entrata offers a unique competitive threat to Yardi's dominance in the Accounting Product Market—and Yardi has acted aggressively and anti-competitively to extinguish that threat and preserve its monopoly power.  Entrata offers a competitive Core Accounting Product (Entrata Core).  However, a high quality competitive Core Accounting Product may not be enough to cause a property management customer to move away from Yardi because of the complexities, risks and migration costs associated with such a move.   Entrata's unique position stems from the widespread market acceptance of Entrata's Integration Products, and Entrata's ability, therefore, to offer customers a more seamless and risk-free transition away from Yardi. Hence, Yardi's ongoing efforts to damage Entrata and impair the functionality of Entrata's Integration Products.

140.    Yardi had similarly interfered with the ability of other providers to compete effectively on the merits of their products.  As discussed above, Yardi has widely communicated to the market that it is going to discontinue the use of all custom integrations for *all* participants in the market.

141.    As set forth above, Yardi continues to commit anticompetitive acts such as forcing its mutual customers into intentionally anticompetitive agreements through coercion and disseminating false statements intended to damage Entrata reputation in the market.  As illustrated by Yardi's previous history of working collaboratively with Entrata for their mutual benefit and the benefit of their customers, Yardi's recent anticompetitive strategy lacks any legitimate business justification or purpose, and Yardi's attempts to suggest otherwise only

deepen Yardi's falsehoods.  Yardi's conduct does not improve its product, its operating

efficiency, or its ability to compete on the merits of its Core Accounting Products.  To the

contrary, Yardi is exercising its market power to prevent Entrata from competing on the merits

and foreclosing the benefits that competition would bring to the market.

142.    Because of Entrata's unique ability to present a competitive threat to Yardi's

dominant position in the Core Accounting Product market, Yardi's actions to undermine Entrata

have the effect of injuring the competitive process in the entire relevant product market and

depriving customers of free choice.  Yardi's actions with respect to its other competitors further

substantially and unreasonably interfere with competition overall.  Overall, Yardi's pattern of

anticompetitive conduct has reduced (and continues to reduce) customer choice in the Core

Accounting Product market, and will have the effect of increasing costs, reducing quality, and

reducing output.

143.    The conduct set forth above constitutes unreasonable and anti-competitive means

by which Yardi has willfully acquired and is willfully maintaining its dominant market power in

the Accounting Product Market through anticompetitive means, in violation of the Sherman

Antitrust Act, 15 U.S.C. § 2.

144.    Entrata has suffered direct and tangible injury as a result of Yardi's

anticompetitive conduct and the damage it has caused to free and fair competition in the Core

Accounting Product market.  By reason of the foregoing, Entrata is entitled to injunctive and

monetary relief, including treble damages and attorneys' fees, pursuant to 15 U.S.C. §§ 15 and

16.

/ / /

**SIXTH CLAIM**
**(*Monopoly Leveraging and Attempted Monopolization***
***of the Integration Product Market*)**

145.    By this reference, Entrata incorporates each of the foregoing allegations.

146.    As described above, Yardi has exercised and abused its monopoly power in the Accounting Product Market for the purpose of acquiring and maintaining a monopoly, or attempting to do so, in the related Integration Product Market.

147.    As set forth above, Yardi has monopoly power in the Accounting Product Market. Yardi has begun requiring all of its new Core Accounting Product clients, and pushing its existing Core Accounting Product clients, to move to its new SaaS platform for the general purposes of stifling competition, controlling pricing, and forcing its customers, especially its mid-range to small customers, to choose products only from the Yardi portfolio.  This action precludes or interferes with competition by third-party providers of Integration Products (including but not limited to Entrata) and therefore undermines competition across the relevant market for the sale of Integration Products (either as a bundle or as individual software products). Yardi's conduct is a direct and calculated attempt to extend its dominance from the Accounting Product Market into the Integration Product Market.

148.    As explained above, Integration Products (including but not limited to Entrata's Point Solution Products) enhance the value and marketability of Yardi's Core Accounting Product.  Yardi's own longstanding pattern of behavior and collaboration demonstrates the benefits to Yardi of enabling Integration Products to work with Yardi's Core Accounting Products.  Yardi's recent change of business practice and conduct therefore is economically

irrational in the short run, lacks any legitimate business justification, and is manifestly

anticompetitive as it serves only to foreclose competition on the merits.

149.     The combined strategy of intentionally spreading false information about

competitors, deliberately interfering with the performance of competitive products, and coercing

customers to purchase Yardi's products, has an extremely strong anticompetitive effect on

market competition.  Given Yardi's existing dominance and market power in the Accounting

Product Market and the perniciousness of its anticompetitive conduct, there is a dangerous

probability that Yardi will acquire monopoly power in the Integration Product Market, to the

exclusion of Entrata and other competitors.

150.     Overall, Yardi's pattern of anticompetitive conduct has already reduced (and

continues to reduce) customer choice in the Integration Product market (both for bundled

products and individual software product), and will have the effect of increasing costs, reducing

quality, and reducing output.

151.     The conduct set forth above constitutes unreasonable and anti-competitive means

by which Yardi is attempting to monopolize the Integration Product Market, in violation of the

Sherman Antitrust Act, 15 U.S.C. § 2.

152.     Entrata has suffered direct and tangible injury as a result of Yardi's

anticompetitive conduct and the damage it has caused to free and fair competition in the

Integration Product market.  By reason of the foregoing, Entrata is entitled to injunctive and

monetary relief, including treble damages and attorneys' fees, pursuant to 15 U.S.C. §§ 15 and

26.

/ / /

### SEVENTH CLAIM
#### *(Unlawful Tying)*

153.     By this reference, Entrata incorporates each of the foregoing allegations.

154.     Yardi's Voyager product (the tying product) and the corresponding Accounting Product Market are separate and distinct products and markets from Yardi's Plug-In Products (the tied products) and the corresponding market for Integration Products (the "Tied Product Market").

155.     In today's rental and economic climate, point solution or integration products are essential for any large property management company—rental customers simply expect to be able to interact with their property management firm through online portals that provide account and service access.  Recognizing this reality, Yardi seeks to coerce purchasers of its Voyager product to also purchase its Plug-In Products, rather than the integration products of Yardi's competitors (such as Entrata's Point Solution Products) by, at least, both refusing to certify or allow the use of Integration Products, refusing to install Entrata Integration Products, discontinuing the allowance of Entrata Integration Products, and by causing and coercing customers in the Accounting Products Market to purchase Yardi Integration Products or abstain from purchasing Integration Products from any other provider.

156.     Yardi has sufficient economic power in the Accounting Product Market for its tying product, Voyager, to coerce at least some of its customers into purchasing its tied products (*i.e.*, the Plug-In Products), or at least to preclude customers from purchasing competitive products (including Entrata's Point Solution Products).  As alleged above, that power derives both from Yardi's dominant share of that market as well as the severe and substantial difficulties facing customers attempting or desiring to switch away from Yardi's voyager platform.

157.     Entrata is informed and believes that when Yardi is marketing its Plug-In Products in head-to-head deals against Entrata's Point Solution Products, or in an effort to displace an Entrata customer to Yardi's Plug-In Products, Yardi offers Plug-In Products for free.

158.     Yardi has entered into its contracts with Entrata's current and prospective customers in order to restrain interstate commerce within the Accounting Product and Tied Product Markets.

159.     Yardi's unlawful tying is economically irrational conduct in the short term, has no legitimate business rationale, and serves only to foreclose competition in the Integration Product Market.

160.     By reason of the foregoing, Yardi's contracts with its property management clients constitute unlawful agreements or combinations in restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

161.     Yardi's tying is per se unlawful because Yardi controls a dominant share of the Accounting Product Market and has market power in that market.  In addition, competition in the Tied Product Market has been and is appreciably restrained as a consequence of Yardi's conduct.

162.     Yardi's conduct affects more than a not insubstantial amount of commerce in the Accounting Product and Integration Product markets.  For example, as discussed above, Yardi has entered into agreements and coerced customers wrongfully depriving Entrata of over $1.9 million in annual revenue.  The amount of business affected by Yardi's tying arrangement is at least this much, but presumably, will continue to increase.

163.     Entrata has been harmed as a consequence of Yardi's conduct.

164.    By reason of the foregoing, Entrata is entitled to injunctive and monetary relief, including treble damages and attorneys' fees, pursuant to 15 U.S.C. §§ 15 and 26.

### EIGHTH CLAIM
### (*Breach of Contract – Third Party Beneficiary*)

165.    By this reference, Entrata incorporates each of the foregoing allegations.

166.    Yardi has entered into contracts with Yardi-hosted customers that utilize the Entrata custom integrations.  In those contracts, the mutual customers of Yardi and Entrata have signed riders that specify Entrata's Point Solution Products by name, as well as the amounts the mutual customers will pay Yardi in order to use the custom integrations.  Additionally, other contracts between mutual customers of Entrata and Yardi contain provisions that require Yardi to provide the mutual customers with a 60-day notice if Yardi terminates the Entrata custom integration, and with language that represents Yardi will continue to allow the customers' use of Entrata's custom integrations until the standard integration is coded, tested, and ready to be deployed to mutual customers.

167.    Entrata is a third-party beneficiary under these riders and other agreements described above.

168.    Entrata provided the required services throughout the duration of the contracts until, on or about, January 6, 2015, when Yardi disabled portions of Entrata's custom integrations to the point of terminating portions of the contracted-for services.

169.    Yardi did not provide mutual customers with the required 60-day notice prior to effectively terminating portions of the Entrata services, nor did Yardi continue to allow the use of those portions of the custom integrations, as contracted.

170.     Yardi's unilateral action of disabling portions of the Entrata custom integrations caused damage to Entrata.

171.     Yardi's failure to provide the requisite 60-day notice also caused damage to Entrata because mutual customers have become dissatisfied with Entrata.

### NINTH CLAIM
### (*Breach of Express Contract – 2006 NDA*)

172.     By this reference, Entrata incorporates each of the foregoing allegations.

173.     The 2006 NDA between Entrata and Yardi is a valid and enforceable contract, still in effect between the parties.

174.     Entrata has performed its obligations under the 2006 NDA.

175.     Yardi has materially breached the 2006 NDA by not performing its obligations. Among other things, Yardi has modified, reverse engineered, duplicated, simulated, decompiled, created derivative works from, or disassembled one or more of Entrata's software programs without Entrata's prior written consent, and has used the Entrata Confidential Information it was afforded access to under the terms of the 2006 NDA to the detriment of or in competition with Entrata.

176.     Such acts of breach include but are not limited to Yardi's CEO, Mr. Yardi, instructing his software developers to decompile the Entrata custom integration to obtain its source code and ordering his employees to place the decompiled Entrata source code from the utility in a folder on his desktop for ease of access and review.

177.     Such acts of breach further include Yardi purposefully modifying, removing, renaming, or disabling the diagnostics.asmx file located within Entrata's custom interface files— thereby preventing the transfer of data between Voyager and Entrata's Point Solution Products.

178.    Entrata has suffered damages as a result of Yardi's breach of the 2006 NDA, in an amount to be proven at trial.

## V.    PRAYER FOR RELIEF

WHEREFORE, Entrata prays that judgment be entered in its favor on each of the foregoing claims for relief, and that:

A.    Yardi be preliminarily and permanently enjoined from :

(1)    Publishing or otherwise disseminating falsehoods concerning Entrata (*e.g.*, that Entrata engages in SQL injection, arbitrarily alters Yardi .dll files in the Voyager code, or that newer versions of Voyager do not integrate with Entrata's Point Solution Products); and

(2)    Tortiously interfering with Entrata's existing and potential economic relations;

B.    Yardi be required to promulgate corrective advertising, pursuant to the Utah Truth in Advertising Act, regarding its false and misleading claims that (i) Entrata engages in SQL injection, (ii) Entrata changes .dll files, and (iii) new versions of the Voyager applications do not integrate with Entrata's Point Solutions Products;

C.    Award damages to Entrata (including Yardi's profits) in an amount to be proven at trial, trebled pursuant to 15 U.S.C. §§ 15(a) and 1117(a);

D.    Award Entrata its attorneys' fees, pursuant to at least 15 U.S.C. §§ 15(a) and 1117(a), and Utah Code § 13-11a-4(c);

E.    Award Entrata its costs;

/ / /

F.      Award Entrata prejudgment interest, as applicable; and

G.      Grant Entrata such other and further relief as is just.

## JURY DEMAND

Entrata hereby demands TRIAL BY JURY of all claims and issues presented in this

Action so triable.

Dated:  April 18, 2015                          Respectfully submitted,

                                                Sterling A. Brennan
                                                R. Parrish Freeman
                                                MASCHOFF BRENNAN LAYCOCK
                                                   GILMORE ISRAELSEN & WRIGHT PLLC

                                                Michael A. Jacobs
                                                Eric M. Acker
                                                Jeffrey A. Jaeckel
                                                MORRISON & FOERSTER LLP

                                                By:  */s/ Sterling A. Brennan*
                                                        Sterling A. Brennan
                                                Attorneys for Plaintiff ENTRATA, INC. (F/K/A
                                                PROPERTY SOLUTIONS INTERNATIONAL, INC.)