IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ENTRATA, INC., a Delaware corporation,<br><br>Plaintiff,<br>v.<br><br>YARDI SYSTEMS, INC., a California corporation<br><br>Defendants. | MEMORANDUM DECISION AND ORDER GRANTING ENTRATA, INC.'S EMERGENCY MOTION TO STRIKE YARDI'S SUPPLEMENTAL EXPERT REPORTS IN PART<br><br>Case No. 2:15-cv-00102<br><br>Judge Clark Waddoups |

Before the court is Plaintiff Entrata, Inc.'s Emergency Motion to Strike Yardi's Supplemental Expert Reports of Gordon Rausser and Richard Hoffman, (ECF No. 456).

Background

On February 13, 2019 Entrata filed an Emergency Motion to Strike the Supplemental Expert Reports of Gordon Rausser and Richard Hoffman. (ECF No. 456.) On February 26, 2019, the court entered an order finding that "Yardi ha[d] repeatedly acted in bad faith in delaying the production of the yCRM data."[1] (ECF No. 492 at 24.) On March 4, 2019 the court held oral argument to determine "how sanctions should apply and to what extent." (*See* ECF No. 492 at 26; ECF No. 501.)

As the court discussed in its previous order, the yCRM database "is a tool that Yardi uses to manage its relationships and interactions with its customers and potential customers." (ECF No. 492 at 4 (citation and internal quotation marks omitted).) Entrata's position throughout this litigation has been that the yCRM data is highly relevant and necessary to accurately evaluate

---

[1] Much of the background of this case is discussed in the court's prior order, (ECF No. 492).

1

economic issues related to Entrata's antitrust claims against Yardi.[2] (*See e.g.,* ECF No. 171.) The parties' experts analyzed these economic issues in their extensive expert reports. Discussion of some of these economic issues—and each party's position regarding these issues—provides helpful context for resolving this dispute.

Since Entrata filed its Complaint in February of 2015, it has alleged that there are two distinct markets in this case, at least one of which involves managers of multifamily properties consisting of more than 1,000 units. In its Complaint, Entrata alleged:

> there are separate and distinct product markets for
>
> (a) *core* property management *accounting* software products for use in the **multi-family** housing industry in the United States by "enterprise"-sized property management companies (such as Yardi's Voyager product), **which typically manage at least 1,000 units** ("Core Accounting Products" or the "Accounting Product Market"), and
>
> (b) "plug-in" or portal special purpose software products (such as Property Solutions' Point Solution Products) that integrate or interface with the core property management accounting software products, such as Voyager ("Integration Products" or the "Integration Product Market").

(Compl. ¶ 63, ECF No. 2 at 29–30 (bold added).)

On April 18, 2016, Entrata filed its First Amended Complaint. (ECF No. 55.) In the First Amended Complaint, Entrata alleged:

> there are separate and distinct product markets for
>
> (a) core property management accounting software products (such as Yardi Voyager) used in the **multi-family** housing industry in the United States by "enterprise"-sized property management companies, **which typically manage at least 1,000 units** ("Core Accounting Products" or the "Accounting Product Market"), and
>
> (b) "plug-in" or portal special purpose software products (such as Entrata's Point Solution Products) that integrate or interface with the Core Accounting Products

---

[2] In contrast, Yardi's has taken multiple inconsistent positions regarding the relevance of this data. Yardi's shifting positions are discussed in detail in the court's previous order. (*See* ECF No. 492.)

("Integration Products" or the "Integration Product Market") in the United States.
(Am. Compl. ¶ 96, ECF No. 55 at 40 (bold added).)

On July 23, 2018, Entrata's expert, Dr. Kearl, submitted his initial Expert Report.[3] In his Expert Report, Dr. Kearl "conclude[d] that the relevant product markets . . . in which to evaluate the monopolization . . . claims in this case are" [1] "the market for Core Property Management Systems for Enterprise Property Managers of Conventional **Multifamily** properties"[4] and [2] "the market for Suite Integration Products for Enterprise Property Managers of Conventional **Multifamily** properties that use the Yardi Voyager Core Property Management System."[5] (Expert Report of James R. Kearl, ¶ 35, ECF No. 461-21 at 21 (bold added).) Regarding both markets, Dr. Kearl stated: "unless I otherwise specify, it should be understood I refer to Enterprise-level Conventional Multifamily property managers." (Expert Report of James R. Kearl, ¶ 35, ECF No. 461-21 at 21.) According to Dr. Kearl, "Enterprise Property Managers" are the managers "at issue in this case,"—"managers of multifamily properties consisting of **more than 1,000 units**." (Expert Report of James R. Kearl, ¶ 11, ECF No. 461-21 at 7 (bold added).) Thus, from the beginning of this case, Entrata has taken the position that the relevant market is comprised of managers of multifamily properties consisting of at least 1,000 units.

---

[3] As the court previously noted, Dr. Kearl's report was made without the benefit of complete yCRM data that Yardi was withholding. (*See* ECF No. 492 at 10.) Part of the data was Top Companies Reports which were extracted from the yCRM data.

[4] According to Dr. Kearl, "Core Property Management Systems generally include accounting functionalities such as a general ledger and accounts payable/receivable and enable the creation of specific financial reports. They also manage inventory, assign residents to units (and units to specific properties and properties to bank accounts), and track rent collections." (Expert Report of James R. Kearl, ¶ 12, ECF No. 461-21 at 8.)

[5] According to Dr. Kearl, "Integration Products are sold separately from Core Property Management Systems and are designed to interface with those systems in order to provide additional functionalities such as online availability listings, online tenant screening, online lease execution, and online rent or utility bill payment." (Expert Report of James R. Kearl, ¶ 14, ECF No. 461-21 at 9.)

On August 27, 2018, Dr. Gordon Rausser, one of Yardi's experts, submitted his Expert Reply Report to Dr. Kearl's July 23, 2018 report. (Expert Reply Report of Gordon Rausser, ¶ 3 ECF No. 461-16 at 7.) In this Reply Report, Dr. Rausser criticized Dr. Kearl's relevant market definitions. (*See* Expert Reply Report of Gordon Rausser, ¶ 12 ECF No. 461-16 at 11.) Relevant here, Dr. Rausser argued that "Dr. Kearl's proposed accounting platform market is . . . artificially restricted by proposing that property managers of at least 1,000 units purchase their software in a *separate relevant market* from those who manage less than 1,000 units."[6] (Expert Reply Report of Gordon Rausser, ¶ 12 ECF No. 461-16 at 11 (emphasis in original).) But nowhere in this Expert Reply Report did Dr. Rausser criticize Dr. Kearl for assuming that software used in managing conventional multifamily residential properties is sold in a market different than software used for other types of residential rental properties.

As the court noted in its previous order, when Dr. Kearl wrote his July 2018 Expert Report, Yardi had not yet disclosed all of the relevant yCRM data. (*See* ECF No. 492 at 10.) Yardi had only "produced yCRM data showing the companies" that Yardi "categorized as multi-family . . . ." (ECF NO. 461-5 at 3.) In its May 2018 production, Yardi did not disclose those Portfolios it categorized as "niche"—even if those Portfolios contained multi-family units. (*See* ECF No. 492 at 13–14.) And, as previously discussed, Yardi had not yet disclosed the data

---

[6] Dr. Rausser also criticized Dr. Kearl's "proposed bifurcation between accounting platforms and software that integrates with accounting platforms" because, according to Dr. Rausser, this "violates industry trends toward single-stack solutions, in which providers sell a pre-integrated package of functionality (both accounting and integration) in a single purchase." (Expert Reply Report of Gordon Rausser, ¶ 12 ECF No. 461-16 at 11.) Dr. Rausser also criticized Dr. Kearl for removing "from his proposed accounting platform market the vast majority of Yardi's actual competitors." (Expert Reply Report of Gordon Rausser, ¶ 12 ECF No. 461-16 at 11.) Dr. Rausser also criticized Dr. Kearl's Integration Products market for consisting "only of sales of 'suites' of integration products sold by just Entrata and Yardi to only those using Yardi's Voyager" and ignoring "the fact that these same customers have more than 200 other vendors from whom they can, and regularly do, choose integration products that interface with Voyager in addition to or in lieu of the supposed 'suites.'" (*See* Expert Reply Report of Gordon Rausser, ¶ 12 ECF No. 461-16 at 11–12.)

4

containing a "prior system field" in what it would eventually label "PORTFOLIO2." (*See* ECF No. 492 at 16.) At the March 4, 2019 hearing, Entrata's counsel stated that Yardi's production was incomplete for two distinct reasons. First, it was incomplete because it was "missing companies." Second, it was incomplete because it was "missing fields," or "missing data" for companies that had already been disclosed—like the prior system field data (ECF No. 549 at 89.) As discussed below, the missing data would be used by Entrata's and Yardi's experts in their supplemental reports, but in very different ways.[7]

On February 8, 2019, Dr. Kearl filed a supplemental report. In his supplement, he discussed the "new data field from the yCRM database titled 'Prior System.'" (Supplemental Expert Report of James R. Kearl, ¶ 5, ECF No. 461-9 at 5.) He understood "this field to show the Core Property Management System that a customer used prior to the customer's current system." (Supplemental Expert Report of James R. Kearl, ¶ 5, ECF No. 461-9 at 5.) According to Dr. Kearl, the "use of these two data fields allows for the identification of each instance in the yCRM data where a customer has either switched its Core Property Management System *to* Voyager *from* a non-Voyager system . . . or has switched *from* Voyager *to* another Core Property Management System . . . ." (Supplemental Expert Report of James R. Kearl, ¶ 5, ECF No. 461-9 at 5.) According to Dr. Kearl, "[t]hese data strongly support [his] conclusions regarding switching costs and historical lock-in." (Supplemental Expert Report of James R. Kearl, ¶ 5, ECF No. 461-9 at 5.) At oral argument, Entrata's counsel represented that this field "shows the extraordinary market power" Yardi has, demonstrates "lock in," and "is the field [Yardi] never wanted [Entrata] to see." (ECF No. 549 at 31.)

---

[7] As discussed in the previous order, Dr. Kearl submitted a reply report on December 7, 2018, but did not address the "new" yCRM data that Yardi produced on November 9, 2018. (*See* ECF No. 492 at 15.) On February 8, 2019, both Dr. Kearl and Dr. Rausser submitted supplemental expert reports. (*See* ECF No. 492 at 16–17.)

In his supplemental report, Dr. Kearl also stated that he used the "newly produced data" to conclude that "the current market share for Yardi Voyager in the Core Property Management Systems market for Enterprise-level Conventional Multifamily property managers is over 65%." (Supplemental Expert Report of James R. Kearl, ¶ 9, ECF No. 461-9 at 7.) In reaching this figure, Dr. Kearl stated that he updated exhibits from his previous reports using the "newly produced data." (Supplemental Expert Report of James R. Kearl, ¶ 5, ECF No. 461-9 at 7.)

Dr. Rausser also filed a supplemental report on February 8, 2019. In that report, he argued that "no evidence justifies placing conventional multifamily residential management software in a separate market from other property types." (Supplemental Expert Report of Gordon Rausser, ¶ 8, ECF No. 461-3 at 8.) He further provided that "[t]he updated yCRM data establishes that a large portion of the companies tracked by Yardi operate across [multiple] classes of housing, managing multiple property types. Dr. Kearl has done nothing to evaluate how, or if, this influences their software purchasing decisions." (Supplemental Expert Report of Gordon Rausser, ¶ 8, ECF No. 461-3 at 9.) In support of these arguments, Dr. Rausser included several tables that relied on late produced yCRM data. (Supplemental Expert Report of Gordon Rausser, ¶¶ 10–14, ECF No. 461-3 at 10–13.) Dr. Rausser also included analysis of customer revenues for "companies managing only conventional multifamily versus mixed-use . . . ." (Supplemental Expert Report of Gordon Rausser, ¶ 14, ECF No. 461-3 at 13.)

Additionally, as he did in his August reply report, Dr. Rausser also criticized Dr. Kearl for "limiting the market based on customer size." (Supplemental Expert Report of Gordon Rausser, ¶ 15, ECF No. 461-3 at 14.) Dr. Rausser argued that "[t]he updated yCRM data reinforces," his argument "by showing that 45% of currently active Voyager customers manage

6

*less than* 1,000 units." (Supplemental Expert Report of Gordon Rausser, ¶ 17, ECF No. 461-3 at 15 (emphasis in original).)

On February 14, 2019, Dr. Gregory Adams, an expert for Entrata submitted a declaration. (ECF No. 458.) In this declaration, he explained that he had reviewed Dr. Rausser's February 8, 2019 supplemental report. (ECF No. 458 at 2.) In this declaration, Dr. Adams addressed the tables that Dr. Rausser relied on to argue that conventional multifamily residential management software should not be placed in a separate market from other property types. Dr. Adams stated that "Dr. Rausser did not include these tables . . . in any of his previous reports." (ECF No. 462 at 4.) Dr. Adams also addressed Dr. Rausser's analysis of customer revenues for companies managing only conventional multifamily versus mixed use. Dr. Adams stated that "[t]hese calculations rely on data in the recently produced Portfolio table of the yCRM data base." (ECF No. 462 at 4.) He also stated that "Dr. Rausser did not include these calculations . . . in any of his previous reports." (ECF No. 462 at 4.) Dr. Adams further states:

> Upon initial review of the Rausser Supplemental Report and all associated work product that has been produced to Entrata, I have found that the following analyses are new (in that a similar analysis was not included in Dr. Rausser's previous reports) and that these new analyses (or a substantively similar analysis) could have been performed by Dr. Rausser using data that were available prior to his August 27, 2018 and December 7, 2018 reports . . . .

(ECF No. 462 at 3.) Dr. Adams supports his conclusion by a review table by table to show that Dr. Rausser had available to him the data necessary to provide his opinions at the time of his earlier reports.

At the March 4, 2019 hearing, Yardi's counsel made several arguments in support of Yardi's position that Dr. Rausser's supplemental report should not be stricken.

Yardi's counsel argued that "Dr. Kearl did not analyze in any substantive way those multi-family units in companies not categorized as multi-family [in] yCRM." (ECF No. 549 at

7

66.) In other words, Yardi's counsel argued that Dr. Kearl, in his February 8, 2019 supplemental report, essentially only "talk[ed] about" the companies that Yardi had produced in its "May production." (ECF No. 549 at 71.) Yardi's counsel argued that by only considering the companies Yardi had disclosed in May, and "by not considering those November companies," Dr. Kearl reaches a conclusion regarding the core market share that—in Yardi's view—is inaccurate. (*See* ECF No. 549 at 76.) In contrast to Dr. Kearl, Yardi's counsel argued that Dr. Rausser "consider[ed] . . . multi-family units whether they were in companies designated as multi-family by yCRM or multi-family units in companies that weren't designated as multi-family by yCRM but still have multi-family units." (ECF No. 549 at 75.) Yardi's counsel argued that Dr. Rausser, when considering the more complete set of data, concluded that Yardi has "35.8 percent of the [core] market share." (ECF No. 549 at 76.) Yardi's counsel argued that "striking the reports and only allowing counsel cross-examination on these fairly complex points" would not be adequate to allow the jury to fully understand this information. (*See* ECF No. 549 at 78.)

Yardi's counsel also addressed the "prior system information" contained in PORTFOLIO2. Yardi's counsel acknowledged that Entrata was "correct to point out that" the prior data "wasn't produced," initially, and that Yardi had only "produced the current system [data] but not the prior system [data]." (ECF No. 549 at 72.) But he argued that Yardi "produced that information in December," Yardi analyzed it, and so did Entrata. (ECF No. 549 at 73.) And Yardi's counsel argued that this data "is not some smoking gun piece of material" that supports Entrata's position. (ECF No. 549 at 63.) He argued that "if it is looked at, [it] supports [Yardi's] position about [there] being a lot of switching." (ECF No. 549 at 63.) Regarding the switching data, he argued that Dr. Rausser considered approximately 5,000 companies while Dr. Kearl only

8

considered 440. (*See* ECF No. 549 at 73.) He further argued that when "you consider the full switching data," it is "actually in Yardi's favor." (ECF No. 549 at 74.)

Yardi's counsel also discussed what he believed would be an appropriate sanction. He argued that Entrata "be able to submit any supplemental report they want," and that Yardi "would pay for it." (ECF No. 549 at 70.) He also suggested that Yardi would pay for the fees Entrata incurred in with deposing Dr. Rausser about the yCRM data.[8] (*See* ECF No. 549 at 71.)

In response, Entrata's counsel addressed Yardi's argument that Dr. Kearl only addresses some, but not all, of the relevant data in his supplemental report. Entrata's counsel argued that "[e]very point that" Yardi's counsel made today, "they can do that on cross [examination]." (ECF No. 549 at 84.)

On March 5, 2019, Yardi filed a submission in which it stated that it "intend[ed] to submit a detailed response" to the "accusations and voluminous written submissions" that Entrata made at the March 4, 2019 hearing. (*See* ECF No. 502 at 2.) On March 6, 2019, Entrata filed a response to Yardi's submission. (ECF No. 505.) In this response, Entrata argued that "[t]he Court should not allow Yardi to continue to vexatiously delay and multiply these proceedings with further misleading filings, ***as it has indicated it intends to do*** . . . ." (ECF No. 505 at 11 (emphasis in original).) Entrata also argued that it "deserves all its fees and costs since September 30, 2017 and any other relief and sanctions the Court deems appropriate." (ECF No. 505 at 11.) On March 8, 2019, Yardi filed a Response to Entrata's Response. (ECF No. 510.) In this filing, Yardi stated that it "plans to respond in more detail to the arguments Entrata made at" the March 4 hearing "once it has the opportunity to review the hearing transcript." (ECF No. 510 at 3.) Yardi also "respectfully request[ed] that if the Court plans to consider action on issues

---

[8] Yardi's counsel also stated that Yardi "would consider the Giles deposition as well if that is what the court orders, obviously." (ECF No. 549 at 80.)

outside of Entrata's Motion to strike," in Yardi's view, issues outside of striking Yardi's Supplemental Reply Reports, that the court "allow full and fair briefing on the specific issues the Court wants addressed." (ECF No. 510 at 3.)

Analysis

As the court noted in its previous order, "[f]ederal courts have very broad discretion to exercise their inherent powers to sanction a full range of litigation misconduct that abuses the judicial process." *Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273, 1300–01 (D. Utah 2016) (citation omitted). "These inherent powers are not governed by any rule or statute." *Id*. "They are instead 'necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Id*. (citation omitted). "Within this discretion lies the power to exclude or admit expert testimony . . . whose use at trial is in bad faith or would unfairly prejudice an opposing party." *See Campbell Indus. v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980) (citations omitted).

The court previously found that "Yardi ha[d] repeatedly acted in bad faith in delaying the production of the yCRM data." (ECF No. 492 at 24.) The court also found that sanctions were warranted for Yardi's misconduct. (ECF No. 492 at 25.) The court held oral argument to determine "what sanctions would be appropriate under the circumstances." (ECF No. 492 at 26.) The court stated it was concerned about the practical effects that striking Yardi's expert reports could have at trial. (ECF No. 492 at 25.) After hearing from the parties, the court concludes that striking Dr. Rausser's supplemental expert report is a necessary and appropriate sanction for Yardi's misconduct in delaying the production of its yCRM data.

As initial matter, the court explicitly finds that the late-produced yCRM data should have been turned over to Entrata without court intervention. It is undisputed that the late-produced

data contained in PORTFOLIO2 is relevant to the experts' analyses regarding switching. And is undisputed that Yardi now relies on the data contained in the "niche" portfolios to determine market share. Yardi was in possession of this data but refused to turn it over. Entrata was forced twice seek relief from the court to obtain this data.

Entrata should have had access to this relevant data prior the submission of its initial expert reports. Instead, Entrata was forced to make do with the data it had available to it. (*See* ECF No. 461-21 at 33 n. 127 ("Yardi has produced some of the data upon which the [Top Companies Reports] are based (the 'yCRM' data) although that production does not appear complete. Thus, at this time I rely on the historical TCRs (from 2016 and 2017).").) Yardi's untimely production prejudiced Entrata by depriving Entrata of a full opportunity to review all relevant data from the outset.

In his August Reply, Dr. Rausser argued that "Dr. Kearl's proposed accounting platform market is . . . artificially restricted by proposing that property managers of at least 1,000 units purchase their software in a *separate relevant market* from those who manage less than 1,000 units." (Expert Reply Report of Gordon Rausser, ¶ 12 ECF No. 461-16 at 11 (emphasis in original).) In his February 8, 2019 supplemental report, Dr. Rausser used the late produced data to bolster this argument. (*See* Supplemental Expert Report of Gordon Rausser, ¶ 17, ECF No. 461-3 at 15 (emphasis in original).) Dr. Rausser could have made this argument in August if he had requested from Yardi all of the relevant data. Moreover, as supported by the declarations submitted by Entrata in support of its Motion to Strike Dr. Rausser's supplemental report, much of the data Dr. Rausser relies upon was available and could have been used in his August 2018 report if he had believed it important to his analysis.

Additionally, Dr. Rausser criticized Dr. Kearl by arguing that "no evidence justifies placing conventional multifamily residential management software in a separate market from other property types." (*See* Supplemental Expert Report of Gordon Rausser, ECF No. 461-3 at 8.) The court finds that Dr. Rausser's arguments in this section of his supplemental report constitute new argument relating to market theory. Yardi's counsel effectively conceded as much at oral argument. (*See* ECF No. 549 at 92.[9]) These arguments could and should have been disclosed earlier. Dr. Rausser effectively denied Dr. Kearl the opportunity to respond to those criticisms in formulating the opinions he would offer at trial. Again, Dr. Rausser could have made this argument in his August report if he had chosen to do so and if Yardi had provided him with all of the relevant data.

Dr. Rausser, in making new arguments in his supplemental reply report, and bolstering old arguments using some of the most relevant—and previously available data—has prejudiced Entrata. Yardi should have made these arguments in August, and Entrata should have been able to reply to these arguments in December. The court finds that Entrata is prejudiced by Yardi's sandbagging.

Yardi argues that Entrata should "be able to submit any supplemental report they want," and that Yardi "would pay for it." (ECF No. 549 at 70.) Yardi would also pay for the fees Entrata incurred by deposing Dr. Rausser about the yCRM data. (*See* ECF No. 549 at 71.) Entrata argues that this is not "a sanction at all." (ECF No. 549 at 81.) Entrata argues that "[t]hat just says we continue on as if it is a regular case and regular expert discovery and we get to respond." (ECF No. 549.) The court agrees with Entrata.

---

[9] "Dr. Rausser makes the observation in those paragraphs 8 through 14, well these, all these companies with may different housing types how come no one has analyzed how that affects their software purchasing decisions? That— *that is something somewhat different that what has been discussed before*." (emphasis added).

If the court were to adopt Yardi's proposed sanction, Yardi would be placed in the same position it would be in if it had disclosed the relevant yCRM data from the outset as required by numerous requests and court orders. This would reward Yardi's misconduct and could encourage other parties in future cases to engage in the same risk calculus. Stronger sanctions are required to deter this type of behavior. The court strikes Dr. Rausser's supplemental expert report, (ECF No. 461-3). The court is concerned, however, that the jury in this case should be allowed to consider all of the evidence relevant to the determination it will be required to make. The jury is also entitled to hear appropriate challenges to Dr. Kearl's analysis and opinions, including whether he failed to consider relevant data that may impact or raise questions about his conclusions. Cross-examination is the appropriate vehicle to test Dr. Kearl's opinions. At trial, Yardi will be allowed to cross-examine Dr. Kearl regarding his supplemental report and any deficiencies in his analysis. Such cross-examination may include all data, including yCRM data, to which Dr. Kearl had access at the time he issued his February 8, 2019 supplemental report.

## Conclusion

I. As a sanction for Yardi's repeated bad faith in delaying the production of the yCRM data, Dr. Rausser's February 8, 2019 expert report is stricken. Dr. Rausser may rely upon opinions and data fairly disclosed in his August 2018 Reply Report.

II. Entrata argues that it "deserves all its fees and costs since September 30, 2017 . . . ." (ECF No. 505 at 11.)

   a. If Entrata seeks its fees and costs since September 30, 2017, it is respectfully instructed to submit a Motion for Further Monetary Sanctions on or before April 12, 2019. The Motion must be supported by appropriate declarations, schedules, and billing invoices.

    b. If Entrata submits a Motion for Further Sanctions, Yardi may submit any Opposition on or before April 26, 2019.

    c. If Yardi submits an Opposition, Entrata it may submit a Reply on or before May 3, 2019.

III. At oral argument, Yardi was only given "approximately 30 minutes to respond" to Entrata's arguments. (ECF No. 502 at 2.) Yardi's counsel's arguments largely focused on Dr. Rausser but not Mr. Hoffman. The court declines to rule on Entrata's Motion regarding Mr. Hoffman at this time. Yardi, on or before April 12, 2019, is granted to leave to submit supplemental briefing addressing whether striking Mr. Hoffman's report is an appropriate sanction. This submission must not exceed 2,500 words, or in the alternative, ten (10) pages.

DATED this 28th day of March, 2019.

BY THE COURT:

_____
Clark Waddoups
United States District Judge